**UNITED STATES of America,
Appellee,**

**v.**

**Harold FREEDMAN, Appellant.**

**No. 605, Docket 35524.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 9, 1971.

Decided July 6, 1971.

Friendly, Chief Judge, concurred in result.

William B. Gray, Walter M. Phillips, Jr., Andrew J. Maloney, Asst. U. S. Attys., Whitney North Seymour, Jr., U. S. Atty., for appellee.

Jerome J. Londin, Allen Green, Kenneth A. Lapatine, Carro, Spanbock & Londin, New York City, for appellant.

Before FRIENDLY, Chief Judge, WATERMAN, Circuit Judge, and McLEAN, District Judge. *

WATERMAN, Circuit Judge:

Harold Freedman, charged with having violated 18 U.S.C. § 1621, appeals his conviction by a jury for four instances of perjury [1] committed while he was testifying before the Securities and Exchange Commission in connection with an investigation into possible violations of the federal securities laws by three corporations, General Development Corp., Universal Controls Co., and Seven Arts Ltd.,[2] and, in particular, with the activities of Louis Chesler,* a then-current ten per cent beneficial owner and officer or director of all three. Appellant was sentenced to concurrent one-year and one day terms of imprisonment on each of Counts Three, Four and Five, and ordered to pay an aggregate payment of $3000 in fines; a sentence on Count One was suspended and Freedman was placed on unsupervised probation for a period of five years with the special condition that he not engage in the securities business in any manner during the five year period. For the reasons stated below, we affirm the conviction on Count One, and reverse the convictions on Counts Three, Four and Five.

Freedman was, for the period 1958–1962, a registered sales representative and manager of Bache and Company, a New York based stock brokerage firm; during that time Bache transacted sales of more than one million shares in the three corporations. Freedman was also a close friend of Chesler. Freedman was called to testify before the SEC and appeared on four occasions. On July 7, 1964 and February 17, 1965 he was specifically questioned under oath about any gifts he had received or profit-sharing arrangements he had made with his customers. It was conceded that such are proscribed by the rules of the New York Stock Exchange to which Freedman had subscribed. Some of his responses are believed to have been falsehoods and they were the basis for the

---

* Of the Southern District of New York, sitting by designation.

1. Appellant was convicted on Counts One, Three, Four and Five. The indictment alleged six acts of perjury in violation of 18 U.S.C. § 1621 (Counts One through Six), and six instances of making false statements in violation of 18 U.S.C. § 1001 (Counts Seven through Twelve). Counts Two and Eight were dismissed by the court at the close of the Government's case. The jury acquitted on Counts Six, Seven, and Nine through Twelve, and therefore none of the Counts bottomed upon 18 U.S.C. § 1001 are before us on this appeal.

2. The SEC's investigation commenced in 1963 and terminated during 1966 or 1967. In particular, the Commission was seeking to determine whether the mails or other interstate facilities had been used to offer to buy or sell, or to buy or sell, unregistered securities, 15 U.S.C. § 77e(a) and § 77e(c) ; to offer to buy or sell, or to buy or sell, securities by fraud, 15 U.S.C. § 77q(a) ; and whether stock prices had been manipulated.

* Occasionally misspelled in record as "Chessler".

prosecution for perjury. Among these responses were the statements set forth in the four counts of perjury upon which he was convicted.

## COUNT ONE

■ Freedman denied, while testifying on February 17, 1965, that Chesler had "anything to do" with the financing of the purchase of General Development stock in the latter part of 1959 by Maxwell Gluck, former United States Ambassador to Ceylon, and a customer of Bache. The jurors could find from the evidence at the perjury trial that in October 1959 Freedman entered into a profit-sharing arrangement with Gluck. The agreement provided that if Gluck would put up a certain amount of cash toward the purchase of 10,000 shares of General Development, Freedman would supply financing for the balance, each of them to share equally in any profit or loss upon a subsequent sale of the stock so purchased. Freedman, in order to fulfill his part of the agreement, contacted a Norman Robbins, who had previously been successful in financing stock purchases through money lenders, to obtain a bank loan for him. At Freedman's trial Robbins testified that Freedman stated to him that Chesler would guarantee the loan. Robbins contacted Ben Cohen, President of Rightgold Trading Co., a money lender, but when Cohen learned that Chesler was to

be the guarantor he refused to make the loan. Freedman and Chesler then individually telephoned Elliot Hyman, Board Chairman and Chief Executive Officer at Warner Bros.-Seven Arts, who agreed to act as guarantor only after he was assured by Chesler that he would not be "hurt as a consequence" thereof. Freedman confirmed in a letter to Hyman that Hyman was to endorse Robbins's note on behalf of Chesler and Freedman.[3] Robbins testified that it was his understanding that the loan Hyman guaranteed was for the benefit of Gluck and Freedman. The total purchase price was $230,000; Gluck paid $60,000 in cash and Cohen, the money lender, provided the $170,000 remainder.[4] Even though Robbins's testimony differed from Hyman's, Hyman's testimony and the introduction of Freedman's letter to Hyman were sufficient to show that Chesler had quite a bit "to do" with the arrangement Freedman had made with Gluck, and was enough to justify Freedman's conviction on this count.

■ However, the prosecution attempted to improve its position by introducing, over defense objection, an alleged prior similar act, not contained in or charged in the indictment, wherein Freedman had falsely sworn to the SEC that he had not received a $20,000 check drawn by Hyman "on behalf of" Chesler.[5] Hyman had testified that he

---

3. The letter is dated February 1, 1960. In pertinent part it stated: "Pursuant to our telephone conversation, you are to endorse a note to Mr. Norman Robbins, Worcester, Mass., on behalf of Mr. Lou Chesler and Harold W. Freedman."

4. A loss was incurred upon sale; Gluck testified that Freedman did not pay his agreed share.

5. Although the questions were poorly phrased they were, in the context of the investigation, unambiguous:

 Q. Now do you know if anybody on behalf of Mr. Ches[s]ler ever gave you any money? A. Gave me?

 Q. You or your daughters money. A. Nothing at all.

 Q. Do you ever recall receiving $20,000 in cash from Ches[s]ler? A. Me?

 Q. You, personally. A. Never.

 Q. Through someone else? A. Never.

 Q. On behalf of Ches[s]ler? A. Never, never.

 Q. That would be never? A. Never.

 Q. You don't recall Mr. Hyman ever giving you $20,000 for Ches[s]ler? A. For me, Mr. Hyman?

 Q. Yes. A. Never.

 Q. You don't recall that in November 1960, when Hyman gave you $20,000? A. When?

 Q. November 1960. A. 1960?

 Q. Yes. A. Mr. Hyman gave me?

 Q. For Ches[s]ler. A. No.

 Q. Do you recall receiving money from Hyman during that time, $20,000?

had given a check to Freedman in that amount "for" Chesler.[6] Appellant first argues that this evidence should not have been admitted because its only relevance was to show Freedman's disposition to commit crimes. He next complains that even if the evidence were properly admitted it should have been withdrawn from jury consideration after it became apparent that the evidence of this prior act was not corroborated under the "two-witness rule." And Freedman finally claims that, in any event, the court erred in charging the jury that it could find that he had a criminal intent to lie at the SEC hearings if it believed that Hyman had made the $20,000 payment.

■ We find no merit in appellant's first contention. Evidence of similar acts by a defendant is admissible to prove his knowledge, intent, or design if knowledge, intent, or design "is placed in issue in the case at trial, either by the nature of the facts sought to be proved by the prosecution or the nature of the facts sought to be established by the defense." United States v. DeCicco, 435 F.2d 478, 483 (2 Cir. 1970); see United States v. Deaton, 381 F.2d 114 (2 Cir. 1967); United States v. Rosenblum, 339 F.2d 473 (2 Cir. 1964). Here, the prosecution's theory was to demonstrate that Freedman did not make any mistake and that he did have an intent or design when he denied that Chesler had any connection with the Gluck transaction. Cf. United States v. Rob-

bins, 340 F.2d 684 (2 Cir. 1965). Whether the probative value of this evidence was outweighed by its potential prejudicial effect was a matter for the trial judge, United States v. Deaton, supra, and a limiting instruction was given. Inasmuch as the prior activity involved a highly similar situation, that is, the denying in the same inquiry the existence of Chesler's role in another deal, and inasmuch as intent was an element of the Government's case, there was no error. United States v. Blount, 229 F.2d 669 (2 Cir. 1956).

■ Appellant's second argument seems to be somewhat related to the first contention. He claims that all the evidence relating to the $20,000 payment by Hyman should not have been submitted to the jury because the testified-to act was not sufficiently corroborated under the "two witness" rule applicable to proof of perjurious testimony.[7] However, the prosecution was not seeking a conviction on this prior act; the court limited the introduction of this evidence solely as relative to demonstrating appellant's intent when he denied Chesler's role in the Gluck transaction, the lie for which he was being prosecuted. The high standard of proof for a charge of a perjury does not govern the admissibility of prior similar acts admitted only to show criminal intent. See Weiler v. United States, 323 U.S. 606, 65 S.Ct. 548, 89 L.Ed. 495 (1945).

■ Finally, Freedman's objection to the jury instruction is not persuasive.

A. The only time I ever got money from Hyman was in the form of a loan or a check.
Q. What is that? A. Elliot endorsed notes for me at times.
Q. But did he ever give you any checks or cash? A. I say he had loaned me money at times which was repaid to him.
Q. I am talking about actual money which you did not have to repay to him. A. No, sir.

6. Freedman had complained to Hyman that Chesler, Hyman's business associate at Seven Arts, owed him (Freedman) $20,000. Chesler, although denying the debt,

was apparently willing to pay it but lacked sufficient funds. Hyman testified that he paid the $20,000 from his own funds because "it was at the stage where our company was a new company and we were seeking bank credit and I was concerned that this kind of talk could affect the company because Mr. Chesler was Chairman of the Board of the Company."

7. Appellant correctly points out that proof of the check's existence was not sufficient corroboration of Hyman's testimony to permit a conviction for perjury. See the discussion infra with respect to Counts Three and Four.

He argues that the court's charge erroneously permitted the jury to consider the fact of Hyman's payment as having a bearing on Freedman's intent, and did not require the jury first to find that Freedman had lied about the payment before they determined whether there had been, in fact, a payment.[8] Appellant mistakes the context of the instruction. During the trial the jury heard the relevant portion of the SEC transcript wherein Freedman denied receiving the check. Hyman's testimony that he had given Freedman the check joined that issue. The court's charge that the jury could find criminal intent if it found that the check had actually passed as Hyman claimed was correct. We agree that further explanation might have been helpful to the jury in its deliberations, but we point out that appellant failed to make this objection at trial even after the court had offered appellant a second opportunity to suggest corrections in the instruction. See Fed. R. Crim.P. 30.

### COUNT THREE

Count Three alleged perjury on February 17, 1965 when Freedman asserted that his arrangement with Gluck was the only profit-sharing arrangement he had made with any customer. Richard Brown, a former customer of Freedman, and an officer of Filmways Television Productions, testified to contradict this statement.

■ Over objection that the arrangement Brown was testifying about had not been between Freedman and Brown but had been between Mrs. Freedman and Brown, Brown was permitted to explain that he and Freedman had agreed to share the profits resulting from the purchase and later sale of 1400 shares of Universal Controls. The stock was sold three months after the purchase. The arrangement was reduced to writing in the form of a letter, introduced into evidence, purportedly signed by Mrs. Freedman, but in fact signed by the defendant. In addition, a check drawn by Brown and made payable to Mrs. Freedman for one-half of the profits resulting from the sale was introduced in evidence to corroborate Brown's testimony. Defendant argues on appeal that this transaction was not material to the SEC investigation. However, Universal Controls was one of the three corporations named in the SEC investigation, and there was testimony with reference to Chesler's involvement in that company. Therefore, any profit-sharing arrangement in the stock of that company was material to the SEC investigation.

Brown also testified that he enjoyed a second arrangement with respect to a quick purchase and sale of Basic Atomics stock. A check for the sum of $1600, made payable to Mrs. Freedman at Freedman's request, was introduced into evidence. Basic Atomics was not named in the indictment as a subject of the SEC investigation and there is no intimation that it was controlled by or related to the three named corporations in which Chesler occupied dominant positions. Nonetheless, the court below instructed the jury that it could convict on this Count solely by reason of this transaction. We are asked to determine both whether Freedman's categorical denial was a material denial so that, if the denial were untrue, Freedman violated § 1621, and whether the Government's proof was sufficient to sustain the conviction.

■ Turning first to the requirements of the two-witness rule, the support of Brown's story provided by the check was insufficient to provide the independent corroboration necessary to justify submission to the jury of the Basic Atomics transaction on Count Three.

---

8. The court's charge was added after the prosecutor noticed that the court had neglected to instruct the jury on the issue: "If you find that that [the payment by Hyman for Chesler] occurred, you can consider that with respect to the defendant's intent bearing upon the testimony where he was questioned about this Chesler transaction."

It is a deeply implanted rule of our jurisprudence that perjury convictions should not rest solely on an oath against an oath, Weiler v. United States, *supra*, and therefore a conviction under § 1621 must be proved by the testimony of two witnesses, or the testimony of one witness corroborated by independent evidence, United States v. Manfredonia, 414 F.2d 760 (2 Cir. 1969); United States v. Marchisio, 344 F.2d 653 (2 Cir. 1965) (and the cases cited therein). While we have accepted circumstantial evidence as adequate independent evidence, see, e. g., United States v. Collins, 272 F.2d 650 (2 Cir. 1959), cert. denied 362 U.S. 911, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960), it must be "of a quality to assure that a guilty verdict is solidly founded," *id.* at 652. This circumstantial evidence must be such that, were it standing alone, it would have independent probative value. Unlike the document in *Collins*, which, standing alone, provided a clear refutation of the perjured statements, the check's probative value only reinforces Brown's recollection.[9] The crucial concern, that of an explanation of the transaction underlying the giving of the check, is not independently explained by proving the check's existence and its negotiation. Absent Brown's definition of the deal, it is devoid in and of itself of any persuasiveness as to why it was given. Inasmuch as no further evidence was introduced on the subject, the court below should have withdrawn consideration of this evidence from the jury.

9. See United States v. Hiss, 185 F.2d 822 (2 Cir. 1950), cert. denied, 340 U.S. 948, 71 S.Ct. 532, 95 L.Ed. 683 (1951).

10. Materiality is a question of law for the court. See, e. g., United States v. Alu, 246 F.2d 29 (2 Cir. 1957); Sinclair v. United States, 279 U.S. 263, 298, 49 S.Ct. 268, 73 L.Ed. 692 (1929); United States v. Singleton, 54 F. 488 (S.D.Ala.1892). The original perjury statute, 1 Stat. 116, did not mention materiality. The predecessor to Section 1621 had consolidated numerous provisions relating to particular tribunals, see Gould & Tucker, 1 Notes on the Revised Statutes of the U.S. 1013 (1889). Materiality was first included as a statutory element in 1873 Rev.Stat. § 5392.

We furthermore understand appellant to argue that insofar as his blanket denial encompassed this transaction, to this extent the falsehood was immaterial and therefore not criminal under § 1621, for to be convicted under that section it must be proved that a witness "willfully and contrary to * * * [his] oath, states or subscribes *any material matter* which he does not believe to be true" (emphasis added).[10] The prosecution argues that a knowingly false statement under oath is a material matter if its "natural effect or tendency" is "to influence, impede or dissuade" further investigation, citing and relying upon Carroll v. United States, 16 F.2d 951, 953 (2 Cir.), cert. denied, 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880 (1927), and that Freedman's effort to hide profit-sharing arrangements had a tendency to impede the SEC investigation.

We do not believe, and it is not seriously argued, that every knowingly false statement under oath is perjurious, for such a ruling would eliminate the materiality requirement.[11] The Government's analysis ignores in *Carroll* what we perceive to be a second essential element in establishing materiality. Implicit in that holding, and in succeeding cases, is the recognition that the "further investigation" of which they speak must have some probative value connected with the scope of the inquiry.[12] That is to say, in order for a knowingly false statement to be material

11. In United States v. Siegel, 263 F.2d 530 (2 Cir.), cert. denied, 359 U.S. 1012, 79 S.Ct. 1147, 3 L.Ed.2d 1035 (1959), this court ruled that the materiality of a matter is, in the first instance, a question for the investigating body, and that a witness cannot object to a question as immaterial unless it is clear that no answer he could give could be material.

12. Cf. United States v. Lattimore, 215 F.2d 847, 867–868 (D.C.Cir. 1954) (*in banc*) (dissent of Judge Edgerton); United States v. Marchisio, 344 F.2d 653, 665 (2 Cir. 1965); United States v. Laut, 17 F.R.D. 31 (SDNY 1955).

within the purview of § 1621, it must be shown that a truthful answer would have been of sufficient probative importance to the inquiry so that, as a minimum, further fruitful investigation would have occurred. Proof of this was absent at trial, and we repeat once again that the materiality of a false statement must be proved to sustain a perjury conviction.[13]

Assuming Brown's testimony to be truthful and Freedman's to be false, the disclosure of the arrangement Brown testified to would not have been fruitful to the SEC investigation of possible violations of the federal securities laws with reference to stock manipulations in the securities of the three named corporations, except possibly to demonstrate how unscrupulous Freedman had been. Had the inquiry been concerned with Freedman's fitness to serve as a registered representative, this information would most assuredly have been material.

 In view of the foregoing discussion we also hold that the evidence given by Brown relative to the transaction in Basic Atomics stock should have been excluded, for Freedman's denial of it, even if untruthful, was not a "material matter" upon which a perjury charge can be founded.

 Inasmuch as the court below instructed the jury that it could convict on this Count solely by reason of the Basic Atomics transaction, the conviction on this Count must be reversed.

## COUNT FOUR

In Count Four of the indictment, the grand jury, after repeating its general allegation that it was material to the SEC investigation to ascertain whether Freedman had received gifts from customers in connection with dealings in the stock of the three named corporations, alleged that Freedman had committed perjury on July 7, 1964 when he stated that he had never received gifts from customers while a Bache representative.

At trial the prosecution elicited from Mike Bornstein, a former Freedman customer, that he had given a Cadillac to Freedman in 1959 as a Christmas present. A second witness, Morris H. Snerson, testified that due to Freedman's efforts he was able to purchase approximately 10,000 shares of Florida Can Co.[14] at a price below the market price and that upon a subsequent sale he had realized a $150,000 profit, from which he had given Freedman a check for $30,000.[15] The check was introduced into evidence.

 Disclosure of the Bornstein gift would not have been helpful to the SEC's investigation. An examination of the transcript indicates that the prosecution never sought to tie the gift of the Cadillac to a purchase or sale of stock in any of the three named corporations; indeed, no reference to those companies was made in any way in any part of Bornstein's testimony. This omission was fatal.

---

13. United States v. Stone, 429 F.2d 138 (2 Cir. 1970), and the cases cited therein at 140; United States v. Yetman, 196 F.Supp. 473 (D.Conn.1961). For a discussion of materiality with respect to 18 U.S.C. § 1621 and also 18 U.S.C. § 1001, see United States v. Silver, 235 F.2d 375, 377 (2 Cir.), cert. denied, 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80 (1956).

14. Florida Can Company subsequently became known as General Development Corporation.

15. Freedman notified Snerson that the stock was available and could be purchased at two or three points below the market price if purchased in its entirety. Snerson expressed interest but added that he would require financial assistance, although he objected to any arrangement which would allow him to be called on margin. Undaunted, Freedman found a willing lender under the conditions imposed by Snerson and the stock was purchased. On cross-examination Snerson stated that he had given the $30,000 to Freedman because Freedman had obtained a lower than market cost for him and had found a good financial arrangement for him, all with the implication, which the jury rejected, that the money was only given for services rendered.

Nor are we persuaded by a government claim that Freedman's false answer went to a material matter because of its bearing on his credibility, a material matter. The cases cited by the Government in support of this claim do not stand for the proposition claimed; they only indicate that when one's credibility is an issue, knowingly false statements under oath on the subject "may be material in the sense required for a perjury conviction." United States v. Letchos, 316 F.2d 481, 484 (7 Cir.), cert. denied, 375 U.S. 824, 84 S.Ct. 65, 11 L.Ed.2d 57 (1963); Harrell v. United States, 220 F.2d 516 (5 Cir. 1953).

■■■■ However, Freedman's answer with reference to the Snerson testimony did relate to a material matter. Even though the question asked of him was unnecessarily overbroad, it thrust to the very heart of the inquiry: the sales of stock by Freedman in one of the three named corporations and the possible use in those sales of manipulative devices. Nevertheless, despite the materiality of the contradictory stories, the jury should not have been permitted to convict on Count Four on the basis of the evidence of the Snerson gift for Snerson's evidence was not independently corroborated pursuant to the requirements of the two-witness rule. Just as in the instance of the check from Brown to Mrs. Freedman, proof of the existence of Snerson's $30,000 check was insufficient corroboration to establish independently that it was given to Freedman as a gift.

## COUNT FIVE

Count Five alleged perjury on February 17, 1967 in that Freedman, after recalling the Bornstein gift, persisted in denying that he had received any other gifts from customers.[16] To prove perjury, the prosecution relied on its evidence of the Snerson gift. Inasmuch as this evidence was not enough to prove perju-

ry, and inasmuch as no other evidence in support of the count was presented, Count Five should have been dismissed at the close of the Government's case.

Affirmed as to Count One, reversed as to Counts Three, Four and Five.

FRIENDLY, Chief Judge:
I concur in the result.

16. In his testimony of July 7, 1964 Freedman denied receiving *any* gifts. On February 17, 1965 he recalled that he had received a car from Bornstein. But he denied receiving any other gifts from any other customers.