**UNITED STATES of America,
Appellee,**

v.

**Stephen MANCUSO, Defendant-
Appellant.**

**No. 193, Docket 73–2109.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 25, 1973.

Decided Oct. 10, 1973.

Roy R. Cesar, Buffalo, N. Y., for appellant.

John T. Spotila, Washington, D. C., Atty. for the U. S. Dept. of Justice (John T. Elfvin, U. S. Atty., for the W. D. N. Y., Jerome M. Feit, Washington, D. C., Atty., for the U. S. Dept. of Justice, and Lloyd George Parry, Special Atty. for the U. S. Dept. of Justice, Buffalo, N. Y., on the brief), for appellee.

Before KAUFMAN, Chief Judge, MOORE and MANSFIELD, Circuit Judges.

KAUFMAN, Chief Judge:

It is in the nature of a perjury case that there be conflicting versions of the underlying facts—one version, constituting the claimed perjury, having been asserted by the accused at a prior proceeding, and the other being put forth by prosecution witnesses at trial. We are met in this appeal with an unusual case in which *three* versions have appeared, with the appellant having maintained essentially the same position at both proceedings, but the Government witness having himself given two conflicting stories at trial.

Mancuso appeals his conviction following a jury trial, on two counts of a three-count indictment brought under 18 U.S.C. 1623.[1] Three portions of his testimony, given on May 23, 1972, before a United States grand jury empaneled in the Western District of New York, were alleged to be perjurious. The jury acquitted on Count One. On Counts Two and Three Judge Curtin imposed concurrent terms of imprisonment of 18 months, with two months to be served in a jail-type institution, the balance suspended, and probation for two years.[2] Although Mancuso mounts numerous attacks upon these convictions, we deem it necessary to treat only one issue extensively—whether the testimony embodied in either count satisfied the materiality requirement of the statute.

The grand jury investigation centered on extortion and official corruption involving the construction industry and certain public officials of the City of Batavia, New York. More particularly, the inquiry concerned possible illegalities surrounding a specific construction project performed by the Twin Village Construction Corporation ("Twin Village") for the City of Batavia in the latter half of 1970.

Prior to Mancuso's appearance, the grand jury had heard testimony from Joseph Laraiso.[3] The pertinent parts of Laraiso's testimony concerned three matters. He testified that Twin Village had been extorted by Joseph Zito in its

---

1. Section 1623 reads, in pertinent part:

    (a) Whoever under oath in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both.

2. Judge Curtin continued Mancuso's release on $5000 recognizance pending the determination of this appeal.

3. Laraiso was president and part-owner of Twin Village during the relevant period of

May to December 1970. In December 1970 he was apparently forced out of the corporation by his brother, Carmen Laraiso, who then became its president.

Laraiso approached first the Federal Bureau of Investigation and then attorneys of the Department of Justice Strike Force based in Buffalo, New York, and divulged to them a pattern of illegal conduct in which he and Twin Village had been involved. The grand jury investigation was commenced and conducted largely on the basis of Laraiso's information.

ultimately successful attempt to secure a contract awarded by the City for reconstruction of Dewey Avenue,[4] and that he rewarded Zito by putting him on the payroll of that project for several weeks, although Zito neither did nor was expected to do any useful work. He stated that soon after the project began, in May or June 1970, an unforeseen problem arose on the site.[5] He instructed Mancuso, Twin Village's project supervisor, to offer John Claypool, Batavia's Chief Engineer, a bribe to persuade Claypool to recommend that the contract be modified.[6] Finally, he asserted that soon after Claypool refused to alter the contract, Laraiso and Mancuso learned of an incipient City investigation of the attempt to bribe him. Zito offered to "fix" this investigation by bribing certain City Councilmen. Laraiso was agreeable, but needed a method of transmitting funds to Zito for this purpose. Laraiso and Mancuso hit upon the idea of having Laraiso draw a $500 corporate check to Mancuso. Mancuso cashed the check, and gave the proceeds to Zito, but the problem arose of accounting for the check to Mancuso. At a meeting among Mancuso, Joseph Laraiso, and Laraiso's brother Carmen, Mancuso suggested that

he would be willing to execute a $500 bill of sale to the corporation for a fictitious sale of a chain saw and surveyor's transit. This procedure was adopted.

After this testimony by Joseph Laraiso, Mancuso was called to appear before the grand jury. He was served with a subpoena at about 6:00 p. m. on May 22, requiring him to appear before the grand jury the following morning. He did so, without having consulted an attorney. The Justice Department prosecutor presenting the case to the grand jury, Robert Ozer, informed Mancuso that the grand jury was investigating possible crimes against the United States, but did not identify the specific nature of the inquiry. He advised Mancuso that he could consult an attorney at any time, and that he need not answer questions which might incriminate him. Mancuso waived his right to confer with counsel and answered all questions, often elaborating upon his responses extensively. Relying on Laraiso's story, Ozer asked him, *inter alia,* whether Zito was a bona fide employee during the period he was on the Dewey Avenue payroll (Count One),[7] whether Mancuso ever told Laraiso to falsify the Twin Village records to account for a $500 check to

4. Zito and another individual, Frank Valenti, were ultimately indicted and convicted for extortion in violation of the Hobbs Act, 18 U.S.C. § 1951. Although the record of that trial is not before us, the record in the present case indicates that the extortion scheme included "prevention" of labor union difficulties in Twin Village's performance of the Dewey Avenue project and threats of personal violence against Joseph Laraiso, in addition to "help" in securing the contract.
   Apparently no charges have been brought against any public officials of the City of Batavia as a result of this investigation.

5. The crew unexpectedly struck bedrock at a depth of 10 feet below the street. The contract called for the sewer line to be installed 15 feet deep, and provided no added payment for the extra excavation expense, which Laraiso estimated to be $4,500.

6. Laraiso had met Mancuso, who was an experienced but then unemployed construction man in Batavia, in the spring of 1970. He offered Mancuso employment if Mancuso

would help him prepare the successful bid on the Dewey Avenue contract, to be awarded by the City in May. Mancuso agreed, and the bid of Twin Village was the lowest. They learned, however, that the City was reluctant to award the contract to the company, because of its reputation for poor quality work. It was at this point that Laraiso and Mancuso allegedly engaged Zito to "help" secure the contract. Whether through fair means or foul, Twin Village was awarded the job, and Mancuso became its supervisor.
   The contract revisions sought would have provided payment for the unforeseen costs or, alternatively, would have permitted redesign of the sewer.

7. Mancuso testified that Zito performed useful work on the project. At trial he repeated his statement, as Laraiso repeated his testimony to the contrary. On the basis of substantial corroboration of Mancuso's version by other defense witnesses who observed Zito working at the site, the jury acquitted on Count One.

Mancuso (Count Two), and whether Mancuso ever learned of a City investigation of the alleged attempt to bribe Claypool (Count Three).

### I.

The portion of grand jury testimony embodied in Count Two deals with alleged falsification of corporate records. Ozer asked Mancuso whether he had ever received money other than his paycheck from Laraiso.[8] Mancuso freely admitted that on one occasion he had permitted Laraiso to "funnel" a $500 corporate check through him. He stated that he had cashed the check and returned the proceeds to Laraiso. He flatly denied that he had given the money to Zito, and disclaimed knowledge of whether Laraiso had done so.[9] Ozer then repeatedly asked Mancuso whether he had told Laraiso to falsify the corporate records to account for this check. Although Mancuso at first denied any memory of the subject, and then displayed some confusion as to the meaning of the question,[10] he finally made the statement that "I have had no reason to ever even suggest" such falsification. Count Two charged that it was material to the grand jury to know whether Mancuso suggested falsification of Twin Village's records, and that Mancuso's denial was knowingly false.

At the trial Laraiso repeated the version he had related to the prosecutors and the grand jury. On cross-examination, however, the telling event transpired which lifts this case above the commonplace perjury case. In melodramatic fashion, defense counsel pointedly reminded Laraiso that the alleged attempt to bribe Claypool, which Laraiso claimed had occasioned the need to put money in the hands of Zito, occurred at the beginning of the Dewey Avenue project, in May or June 1970. The check and bill of sale, however, bore the date November 12, 1970, when the job was virtually complete. To everyone's surprise and the Government's dismay, Laraiso suddenly remembered on the witness stand that the story he had told the prosecutors more than a year before, and then repeated both before the grand jury and on direct examination at trial, was totally erroneous.[11] He recalled that the transaction in issue had nothing to do with Zito, Dewey Avenue or the City of Batavia at all. He admitted on cross-examination that in November 1970, Twin Village was engaged in the performance of a wholly private construction contract for Litton Industries, in Batavia. This was entirely unrelated to Dewey Avenue, or any other City project. Laraiso then revealed that Andrew Clemons, an individual architect employed by Litton, had helped Twin Village obtain and perform the private contract. Laraiso had decided it would be appropriate to offer Clemons a "gratuity" in appreciation of his assistance,

---

8. Ozer had the $500 check and bill of sale in his possession, but did not show them to Mancuso or indicate their existence. We can say with the luxury of hindsight that had Ozer at least mentioned the date, November 12, 1970, which appears on the two documents to Mancuso, the confusion which engulfed this investigation from the start, but which did not become apparent until the middle of the trial, might have been abated promptly.

9. Other than by suggesting the money had come to rest in Zito's hands, Ozer did not reveal the purpose which, based on Laraiso's story, he believed the transaction had served.

Mancuso stated his understanding of the reason for the "funnelling" to be that Laraiso needed funds personally, but was prevented by a subordination agreement with a bonding company from withdrawing money from the corporation. It was proved at trial that such an agreement did exist during the relevant time.

10. It is apparent that in several of his answers Mancuso equated the word "told" with "instructed," and therefore responded by disclaiming the power to "tell" his employer to do anything.

11. Unfortunately, the briefs submitted on this appeal were inadequate both in the statement of facts and discussion of the law. Only after a reading of the entire transcript have we been able to ascertain all the detailed facts and the bizarre fashion in which the revelations came.

and it was for this purpose that the $500 check to Mancuso and the false bill of sale were intended. Laraiso insisted, however, that as he had originally testified, it was Mancuso who suggested use of the bill of sale to account for the attempted payment to Clemons.[12]

Carmen Laraiso, testifying for the prosecution, parroted his brother by stating that he too suddenly recalled that the transaction involved the Clemons affair, not the Dewey Avenue project.[13] He corroborated his brother's testimony that the bill of sale was Mancuso's suggestion.[14]

Mancuso testified in his own defense at the trial, and insisted that the documents—the check and bill of sale—related to the private architect, not the public contract. He stated his belief that he had not suggested the method of falsifying the corporate records, but could not exclude that possibility.

At the conclusion of the government's case the defense unsuccessfully moved for dismissal of Count Two because the testimony was not material. This motion was renewed at the conclusion of the entire case and again after the verdict. We need not consider Mancuso's claim that the evidence does not support the jury finding of knowing falsity, for we are of the opinion that the trial court erred in failing to dismiss the count for lack of proof of materiality.[15]

## II.

Materiality is an essential element of the statutory offense which the Government has the burden of establishing. United States v. Stone, 429 F.2d 138, 140 (2d Cir. 1970). The Government concedes that whether testimony is material is a question of law to be decided by the court. United States v. McFarland, 371 F.2d 701, 703 n. 3(2d Cir. 1966), cert. denied, 387 U.S. 906, 87 S. Ct. 1689, 18 L.Ed.2d 624 (1967); United States v. Marchisio, 344 F.2d 653, 665 (2d Cir. 1965). The issue, in the language of § 1623(a), is whether the defendant made a "false material declaration."

False testimony before a grand jury need not bear upon the ultimate question of guilt or innocence of specific federal crimes in order to possess the requisite materiality. We have held on several occasions[16] since our landmark case, Carroll v. United States, 16 F.2d 951 (2d Cir.), cert. denied, 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880 (1927), the famous controversy over the lady in Earl Carroll's bathtub, that it is sufficient if the untrue declaration has "a natural effect or tendency to influence, impede or dissuade the grand jury from pursing its investigation. . . . ." 16 F.2d at 953. We are required to examine both the nature of the inquiry at which the testimony was given and the evidence introduced at trial to prove its falsity, in order to deter-

12. Laraiso testified that "somewhere" there was another $500 check which did involve Zito and the attempt to quash investigation of the Claypool incident. This check, of course, never came to light.

13. He also remembered that he had ultimately offered the gift to Clemons, who refused it, and that he had then returned the money to his brother Joseph.

14. Corroboration was not a prerequisite to this prosecution. § 1623(e) specifically abrogates the "two-witness rule" for prosecutions brought under that section.

15. Our prior decisions dealing with materiality of testimony in perjury prosecutions have

arisen under 18 U.S.C. § 1621, the older, more general statute. There is, however, nothing in § 1623, the newer provision under which the present prosecution was brought, to indicate that Congress intended any change in the nature of the materiality requirement, nor is this a matter of contention.

16. E. g., United States v. Cohn, 452 F.2d 881, 883 (2d Cir. 1971), cert. denied, 405 U. S. 975, 92 S.Ct. 1196, 31 L.Ed.2d 249 (1972); United States v. Marchisio, 344 F.2d 653, 655 (2d Cir. 1965); United States v. Collins, 272 F.2d 650, 652 (2d Cir. 1959), cert. denied, 362 U.S. 911, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960).

mine whether a truthful answer could conceivably have aided the grand jury investigation.[17]

The ultimate issue, therefore, is whether the Government has shown that it could possibly have assisted the grand jury if it knew that Mancuso suggested the means of accounting for an attempted "gratuity" to the private architect, Clemons, in connection with a job unrelated to the inquiry. We believe that the evidence totally fails to support such a view. The question posed to Mancuso related to a wholly immaterial event. Neither the answer he in fact gave nor the truth he allegedly concealed could have impeded or furthered the investigation. The question could not, therefore, have elicited a material reply. See cases cited note 17, supra. The only argument offered in support of materiality is that until Mancuso testified, the grand jury had received a single coherent version of the facts from Laraiso. Mancuso's contradiction of Laraiso's claim that Mancuso suggested the false bill of sale presented the first conflict in evidence, which, it is said, confused the grand jury, forced it to reconsider its investigation, and therefore in a general sense "impeded" the inquiry. The difficulty with this argument is that the grand jury's confusion is more properly traceable to Laraiso's erroneous testimony, compounded by prosecutor Ozer's misapprehension, that the transaction bore some relationship to the alleged bribery associated with the Dewey Avenue job, when in fact it did not. Had Mancuso admitted that he told Laraiso

17. There is language in United States v. Siegel, 263 F.2d 530 (2d Cir.), cert. denied, 359 U.S. 1012, 79 S.Ct. 1147, 3 L.Ed.2d 1035 (1959), which may seem to imply that materiality exists unless the question, divorced from the context in which it was asked, could not have elicited a material reply. Our precedents, including Siegel, demonstrate that such a view cannot be maintained; see, e. g., Carroll v. United States, 16 F.2d 951 (2d Cir.), cert. denied, 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880 (1927); United States v. Hirsch, 136 F.2d 976 (2d Cir.), cert. denied, 320 U.S. 759, 64 S.Ct. 66, 88 L.Ed. 452 (1943); United States v. Marchisio, supra; United States v. Stone, supra. In each case the court has examined the factual background to determine whether the question had some bearing on a subject which was material to the proceeding, and whether a truthful answer might possibly have aided the inquiry. We have never permitted materiality to turn simply on whether the question, on its face, could conceivably have evoked a material reply.

We recently stated in United States v. Freedman, 445 F.2d 1220, 1227 (2d Cir. 1971), that before the materiality requirement could be satisfied, the Government was required to establish ". . . that a truthful answer would have been of sufficient probative importance to the inquiry so that, as a minimum, further fruitful investigation would have occurred." This statement was repeated in United States v. Birrell, 470 F.2d 113, 115 n.1 (2d Cir. 1972). Neither Freedman nor Birrell, however, concerned grand jury investigations. Both cases involved alleged perjury in contexts where the factual questions to be determined were clearly defined. In Freedman the Securities and Exchange Commission was investigating securities laws violations concerning the shares of three named corporations. The failure of the witness to disclose a profit-sharing agreement relating to the stock of a wholly unrelated corporation could not have had any bearing on that inquiry. In Birrell the issue was a narrow one—whether Birrell was indigent and therefore entitled to appointment of counsel.

The issues before a grand jury, however, are not predetermined. Its function is to investigate possible crimes against the sovereign so that it can make a judgment whether a trial on specific charges is necessary. The scope of legitimate inquiry is therefore broad, and materiality of testimony may more readily appear than in a proceeding whose dimensions are established at the outset. United States v. Stone, supra, 429 F.2d at 140; United States v. Cohn, 452 F.2d 881, 883 (2d Cir. 1971), cert. denied, 405 U.S. 975, 92 S.Ct. 1196, 31 L.Ed.2d 249; see Branzburg v. Hayes, 408 U.S. 665, 701, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

Because of this investigative, rather than adjudicative, function, our prior decisions state the test of materiality of grand jury testimony to be whether a truthful answer could conceivably have furthered the inquiry. We need not decide whether the more stringent view of materiality, expressed in Freedman and Birrell, has effected any change in the test as it applies to a grand jury proceeding, for we are of the opinion that on any view of this case, the testimony was not material.

how to falsify the corporate records, the misconception would have been reinforced, not dissipated. We therefore cannot agree that the truth Mancuso allegedly concealed could conceivably have led to the discovery of relevant evidence or that his alleged false statements tended to influence, impede or dissuade the grand jury from pursuing its investigation. A finding of materiality must have some basis in the content of the testimony itself. That which is otherwise wholly immaterial cannot become material solely because a prior witness, innocently but mistakenly led on by the prosecutor, has given the false or erroneous impression that it has some materiality. Accordingly, we reverse the conviction on Count Two.

## III.

The Count Three conviction is grounded in Ozer having asked Mancuso before the grand jury whether he and Laraiso ever received word that the City was to begin an investigation of them concerning a bribe attempt. This elicited an "answer" which consumes more than three pages of the grand jury transcript. Mancuso admitted learning of the investigation, and then in great detail described a second meeting he claimed he initiated with Claypool. Mancuso's version was that he convinced Claypool of his error in having construed Mancuso's prior effort to persuade him to approve revision of the Dewey Avenue contract

as a bribe offer. Count Three alleged that this testimony was false because a second meeting never occurred.

■■ At trial Claypool testified that Mancuso had offered a bribe at their one and only meeting.[18] Claypool stated that this had angered him greatly, causing him to depart promptly. He reported the incident to his superiors. When asked whether he had any second meeting with Mancuso such as the latter had described, he replied three times, "Not that I recall, no."[19]

Mancuso's attacks on the sufficiency of the evidence to support Count Three are wholly without merit. We shall treat only the claim that his testimony concerning the claimed second meeting with Claypool lacked the requisite materiality. We deem this desirable to explicate further our discussion of Count Two.

■ The claim is that the testimony was not material because an indictment dealing with the attempt to bribe Claypool was never returned by the grand jury. Moreover, it is urged, no evidence was introduced at trial to indicate any interstate nexus of the incident to warrant federal jurisdiction. This argument completely misconceives the nature of both the grand jury function and the materiality requirement.

At the time Mancuso appeared, the grand jury had heard testimony from Laraiso depicting a pattern of extortion and public corruption involving Twin

---

18. Before the grand jury, Claypool stated that Mancuso hinted at a bribe. At trial he was more specific:

> [Mancuso] said something along these lines, "What can we do to make you give a favorable recommendation on the extra we submitted for the rock excavation and the sewer," and I said "What do you mean," and he said "Well, Joe [Laraiso] is willing to pay money for it"
> . . .

Mancuso denied vehemently that he had offered a bribe and contended, as he had before the grand jury, that he had convinced Claypool during the putative second conversation that Claypool had misunderstood when Mancuso indicated that the *City* would

save about $500 if redesign of the sewer were permitted.

19. Mancuso's claim that this evidence was insufficient to support the finding that a second meeting had never occurred is frivolous. A witness can only truthfully testify about his current recollection, and the jury could well find on the record before us that if a second conversation had in fact occurred, Claypool would "recall."

There is, of course, no failure of proof in the fact that Claypool was the sole witness to testify that Mancuso had lied. As we have indicated, § 1623(e) has abolished the "two-witness" rule for prosecutions under this statute.

Village and the City of Batavia. An attempt to bribe Claypool, the City's Chief Engineer, could clearly play a significant part in the case being developed, either as an independent crime [20] or as an evidentiary stone in the larger edifice. And although it is certainly not necessary to materiality of grand jury testimony that an indictment be returned, the fact that Zito and Valenti were ultimately indicted and convicted for federal crimes establishes *a fortiori* that the possibility of federal jurisdiction existed.

Since evidence of the bribe attempt itself would be material, Mancuso's false testimony that he had convinced Claypool that there had been no bribe offer was clearly material, as it tended to impede or dissuade the grand jury from pursuing its investigation. Carroll v. United States, *supra*; cases cited note 16, *supra*. Neither the failure of the grand jury to return an indictment concerning the alleged bribery attempt, nor the absence of proof that federal jurisdiction over it would have existed, is relevant to the issue of materiality. The conviction on Count Three is affirmed. We have reviewed appellant's other arguments and they are equally unpersuasive.

Since the trial court imposed identical concurrent sentences on Counts Two and Three and we have today reversed the conviction on Count Two, it is appropriate that we remand the case to the district court for review of sentence. We do so because of the possibility that conviction on both counts might have affected the punishment set for each.[21] Of course, we do not imply any view on the propriety of the original sentence. We leave the sentence to be imposed entirely to the discretion of district court.

20. The alleged bribery attempt possibly could have constituted a separate federal offense under the so-called Travel Act, 18 U.S.C. 1952, but we need not pass on the question here.

21. *See* United States v. Mapp, 476 F.2d 67, 82 (2d Cir. 1973) ; United States v. Hines, 256 F.2d 561 (2d Cir. 1958) ; *cf.* United States v. Febre, 425 F.2d 107, 113 (2d Cir.), cert. denied, 400 U.S. 849, 91 S.Ct. 40, 27 L.Ed.2d 87 (1970).