UNITED STATES of America, Appellee,

v.

**Marvin MAULTASCH and Richard D. Reddock, Appellants.**

**Nos. 373–74, Dockets 78–1268, 78–1276.**

United States Court of Appeals, Second Circuit.

Argued Nov. 17, 1978.

Decided Feb. 22, 1979.

---

James O. Druker, Kase & Druker, Mineola, N. Y. (Paula S. Frome, Mineola, N. Y., of counsel), for appellant Reddock.

Jonathan J. Silbermann, The Legal Aid Society, Federal Defender Services Unit, New York City, for appellant Maultasch.

Audrey Strauss, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, Robert J. Jossen, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before LUMBARD, FRIENDLY and OAKES, Circuit Judges.

OAKES, Circuit Judge:

Appellants, Marvin Maultasch and Richard Reddock, were the controlling officers of the investment management company that managed the Galaxy Fund, a mutual fund with over $1 million in assets. They appeal from their perjury convictions under 18 U.S.C. § 1621 resulting from their testimony before the Securities and Exchange Commission (SEC). Each was convicted of two counts after a jury trial in the United States District Court for the Southern District of New York before Marvin E. Frankel, Judge.[1] Each appellant raises one argument going to admissibility of evidence, and each makes an argument on sufficiency.[2] We find none of the arguments availing and therefore affirm the convictions.

Succinctly stated, the Galaxy Fund, which appellants controlled, collapsed when the value of securities that they had caused it to buy from S.J. Salmon & Co., an over-the-counter brokerage concern specializing in new issues, collapsed as did the brokerage concern itself. Counts One and Three of the indictment charged Maultasch and Reddock respectively with perjury in their testimony before the SEC concerning the underlying agreement or understanding between Galaxy and S.J. Salmon & Co., by which the former would purchase the latter's securities offerings and the latter would underwrite a public offering of the stock of the company managing Galaxy. Counts Two and Four charged perjury in connection with denials of personal profit by Maultasch and Reddock respectively from one or more customer accounts at S.J. Salmon & Co.

## FACTS

In 1970, appellant Maultasch was an accountant, and appellant Reddock worked as a registered representative at Leyner Dreskin & Co. (Leyner Dreskin), a small securities firm. They consulted J. Richard Leyner, a partner of the firm, about forming a management company or a holding company that would run mutual funds and about obtaining Leyner Dreskin to underwrite a public offering of the shares of the company. Mr. Leyner advised them first to acquire control of a mutual fund. This appellants did in early 1971, acquiring Galaxy Fund (the Fund), a mutual fund with assets of over $1 million. They became officers and directors of the Fund itself as well as of the Galaxy Group, Inc., which served as the management company for the Fund and determined stock purchases for it. The management company had a negative net worth and no ready expectation of profits, but appellants did seriously discuss with Leyner Dreskin a public offering of Galaxy Group, Inc., stock; and Leyner Dreskin undertook to raise about $500,000 from such a sale. Appellants wanted more money, however, and Leyner Dreskin backed out (although Mr. Leyner remained a Fund director) but suggested the firm of S.J. Salmon & Co. (Salmon). Salmon was a securities firm that had underwritten several "hot" new issues. Appellants met with William Helman, Sheldon Salmon, and Jerome Truen, three of the partners in Salmon at

---

1. The court sentenced appellant Maultasch to one year's probation and a $100 fine on each count; it sentenced appellant Reddock to one year's probation and a $1,000 fine on each count.

2. As is customary in separate appeals from criminal convictions at a joint trial, each appellant adopts by incorporation the arguments that the other raises. See Fed.R.App.P. 28(i). We refer throughout the opinion to the appellant who makes the primary argument.

its office in early 1971. Helman and Truen were subsequently to testify as principal witnesses for the Government that Salmon agreed at that time to underwrite the public offering of the Galaxy Group, Inc., stock and that appellants agreed to buy Salmon issues for the Fund. Maultasch shortly thereafter reported to Mr. Leyner that Salmon would participate in the underwriting and that it was "expected" that the Fund would purchase Salmon stocks.

After appellants and Salmon concluded the underwriting deal, the Fund began to acquire various Salmon stocks: between April 1971 and the end of that year the Fund's holdings of Salmon issues went from none to over $500,000 worth of these "hot" stocks, equal to 60% of the Fund's assets at cost. Mr. Leyner resigned as a director of the Fund in September 1971 because of this "extraordinary activity." In that same month Salmon completed the underwriting of the public offering of Galaxy Group, Inc., which received from Salmon a check therefor in the amount of $774,200 ($888,000 raised in the offering less $113,800 underwriting fees). The questions and answers at the SEC investigation relating to the charges in Counts One and Three based on these agreements and transactions are set forth in the footnote.[3]

Counts Two and Four relate to the following transactions. In March 1971 Maultasch and Reddock visited Baron Motors, a Lincoln-Mercury dealership on Long Island, to purchase for each a new Lincoln Continental. Appellants told owner Bernard Cohen that they wanted to pay for the automobiles out of profits on stock transactions that they would effect in his name; they assured him that the stock transactions would be profitable because they would be new issues that "automatically" would rise to a premium price. Mr. Cohen agreed to the proposed purchase procedure; and each appellant obtained a late model Lincoln Continental for which he put down $1,000, financing the balance of the $7,000 purchase price. Cohen prepared a letter agreement that set forth their understanding that appellants would pay the balance of the purchase price from profits on the stock transactions. Cohen testified that he received from Salmon a new account card which he filled out. Transactions were then effected in his name, and he received checks from Salmon. In accordance with the letter agreement, he applied the proceeds to payments on Maultasch's and Reddock's cars.

Mr. Helman, one of the Salmon partners, testified that in June 1971 he had new issue stock available which he asked Maultasch if he wanted to take "personally"; the latter replied that he did want to take the stock and gave Helman Cohen's name. And in July 1971, after a particularly profitable stock transaction executed in Cohen's name, Maultasch purchased two Mercury Capris and fully paid for them from the proceeds. Some of the "hot" issues were just that.

In the fall of 1971 appellants set up a similar arrangement with Bernice Seidman, who owned a women's clothing store on

3. Count One (false answers are italicized):

Q. Was there any understanding between any employees of Galaxy Management Corporation or of Galaxy Fund, on the one hand, and officers or employees of Salmon, on the other, to the effect that the fund would continue to do business with Salmon if Salmon would underwrite Galaxy Group?

A. [by appellant Maultasch]. *Not at all.*

Q. Were there any conversations at which this matter was discussed?

A. Which matter are you talking about?

Q. That is, an agreement or an understanding, either formal or informal, that Galaxy Fund would effect transactions with or through Salmon because of the fact that Salmon would be underwriting Galaxy Group.

A. *None whatsoever.*

Count Three (false answers are italicized):

Q. Now, to your knowledge, was there any kind of agreement or understanding at all between S.J. Salmon, or its officers, and Galaxy Group, or its officers, concerning giving business to Salmon because it would do the underwriting?

A. [by appellant Reddock]. *None at all.*

Q. Was this matter ever discussed although no understanding or agreement may have been reached?

A. *No.* It was a pleasure to do business with Salmon.

Long Island, arranging to pay for clothing from profits from stock transactions. Just as for Cohen, an account was opened at Salmon in Bernice Seidman's name; after a profitable transaction Maultasch's and Reddock's wives each bought about $1,000 in clothing paid for out of the proceeds in the Seidman account at Salmon. At the SEC interrogation each appellant denied that he had an agreement with any person who had an account at Salmon to share in the profits or losses. The questions and answers that formed the basis for Counts Two and Four are set forth in the footnote.[4]

4. Count Two (false answers are italicized):

Q. Now, did you have an agreement or an understanding with any person—and I would ask you to consider the questions carefully because these are material questions.

A. [by appellant Maultasch]. Yes, sir.

Q. Did you have an agreement or understanding with any person or any corporation *that did have an account at S.J. Salmon that you would share in any profits or losses?*

Mr. Beerman [attorney for Maultasch]: Before he answers the question, I assume that we are eliminating from consideration the Galaxy Fund, because the Galaxy Fund did have an account at S.J. Salmon.

If there was significant appreciation of the Galaxy Fund, it would result in a larger advisory fee to Galaxy Management Corporation, which would inure to the benefit of the principal shareholders of the wholly-owned parent, Galaxy Group, of which Mr. Maultasch is a principal shareholder.

So, I assume that for purposes of all these questions, the relationship or the account or the transactions between the Galaxy Fund, on the one hand, and S.J. Salmon, on the other, is eliminated.

Is that correct?

Mr. Spolter [attorney for the SEC]: I'll accept your qualification of the question.

Mr. Beerman: All right. You can answer the question.

The Witness [Maultasch]: *No.*

Mr. Spolter: Wait. I would like the reporter to read back the question to make sure that the question was complete. (Record read.)

The Witness: *No.*

By Mr. Spolter:

Q. Now, by "profits and losses," I meant profits and losses as a result of trading in that account. Was that clear to you when you answered the question?

A. Yes.

Q. All right. Now, just to clarify the record, apart from one sale during 1971, you state that you did not engage in any securities transactions during the period from Jan-uary, 1971, to October 31, 1972?

Mr. Beerman: Before you answer the question.

Meaning engaged in securities transactions, buy or sell for his personal account?

Mr. Spolter: That's correct.

Mr. Costello [investigator for the SEC]: For his personal account?

Mr. Spolter: For his personal account or with nominees, as we've discussed it before.

The Witness: *None.*

Count Four (false answers are italicized):

Q. Now, was there any account maintained at S.J. Salmon and Company, apart from the Galaxy Fund account, where you advised the person maintaining the account to engage in transactions?

A [by appellant Reddock]. *No.*

Q. Was there any account during this period in S.J. Salmon and Company where you had some understanding or agreement with the person maintaining the account—

A. *No.*

Q. Let me finish the question.

A. I'm sorry.

Q. —to share in profits or losses as a result of trading in that account.

A. *No.*

Q. I'd like to impress upon you that these are material questions and give you the opportunity to reflect upon your answers if you think it's necessary.

A. *I never had any accounts at Salmon. I never put any accounts at Salmon.*

*I never shared any accounts at Salmon.*

Q. And was there any corporation or other entity which did have an account at Salmon, apart from Galaxy again, where you were authorized to place any orders on behalf of that account?

A. None, no.

Q. Now, did you have any interest in any of the securities that the Fund bought during the period from May 1971 to October 1972?

A. No. You mean personal interest?

Q. Either on your behalf or on behalf of your wife and children.

A. *None.*

By Mr. Costello:

Q. Or any other person?

A. *No.*

Mr. Beerman: Other than the Galaxy Fund?

Mr. Spolter: All right.

Mr. Beerman: And the answer, with all of *those qualifications, is?*

The Witness: *I would liked to have bought some once in a while, but we just weren't allowed and we just didn't.*

By Mr. Spolter:

Q. Well, specifically, did you have any interest at all in Comfax?

A. That's the one I wanted to have. *No, nothing at all, nothing at all.*

## DISCUSSION

### ADMISSIBILITY OF EVIDENCE: PRIOR CONSISTENT STATEMENTS

■ Appellant Maultasch's first point relates to the testimony of Helman and Truen, the two Salmon partners, about their understanding of the arrangement by which the Fund would purchase the stock of Salmon issues. After cross-examination of these two witnesses about their agreements with the Government and their own criminal convictions for stock manipulation and fraud, the district court ruled that their declarations to two other Salmon partners as to the 1971 Galaxy arrangement were admissible as prior consistent statements, pursuant to Fed.R.Evid. 801(d)(1)(B),[5] through the testimony of these other Salmon partners. The objection on appeal is not that defense counsel's interrogation was insufficient to constitute an implied charge of recent fabrication or improper influence or motive under the Rule, nor that the Government improperly introduced the prior consistent statements in its affirmative case. Instead, the argument on appeal is that "[r]ather than requiring the Government to recall the declarants—Helman and Truen—to introduce their prior statements, the district court permitted the Government to elicit this evidence through [other Salmon partners] who were only present when they were made."[6] That is to say, appellants contend that because the declarants, Helman and Truen, who did testify at trial, were apparently not present in the courtroom at the time that the trial judge admitted the other partners' testimony as prior consistent statements, the statements were hearsay.

But appellants made no request to the court or to the Government to have Helman and Truen recalled for cross-examination. Not having done so they are in no position to raise the objection now. *See United States v. Fuentes*, 563 F.2d 527, 531 (2d Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977). Defense counsel at trial never argued that the Government must elicit the prior consistent statements first from Helman and Truen as presumably it could readily have done. Counsel did ask that the court preclude the Government from introducing the prior consistent statements of any Salmon partner other than Helman[7] but made no objection that clearly stated the specific ground now asserted on appeal; a claim of error now is unavailing. Fed.R.Evid. 103(a)(1); Fed.R.Crim.P. 52(a); *see United States v. Fuentes, supra.* We do not decide whether prior consistent statements are admissible only through the testi-

---

**5.** Fed.R.Evid. 801(d)(1)(B) provides:

Statements which are not hearsay. A statement is not hearsay if—

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . . .

**6.** Brief for Appellant Maultasch at 14.

**7.** Mr. Segal [defense counsel]: The conversation we are going to get is from Helman and not from anybody else.

The Court: I don't know from whom we are going to get it.

Ms. Strauss [Assistant United States Attorney]: I think he is unable to specify as between Helman, Truen, and Salmon, who made the statements, but I think—

The Court: It is going to one or more of those three and only those three.

Ms. Strauss: Yes.

Mr. Segal: Then your Honor, I think what we have here is really a compounded hearsay question. If it is going to come from anybody, it is Helman. If Truen or Salmon is saying it, if the government is saying that, then it is something they might have to get from Helman. I don't think when testimony comes in like this, in this particular instance, it should not conform at least to some strictures.

The Court: Why should it not be confined to Helman?

Ms. Strauss: Truen also testified and Salmon did too.

The Court: Why not confine it to Helman and Truen?

Ms. Strauss: I will try to do that.

The Court: Maybe I should not allow that if you cannot do that.

Mr. Segal: I will move to strike if it is not done.

The Court: It will be stricken if it is not done.

mony of the attacked witness himself. We note, however, that other circuits have allowed statements elicited not from the attacked witness but from third parties. *See, e. g., United States v. Lanier,* 578 F.2d 1246, 1255–56 (8th Cir. 1978); *see also United States v. Zuniga-Lara,* 570 F.2d 1286, 1287 (5th Cir.), *cert. denied,* 436 U.S. 961, 98 S.Ct. 3080, 57 L.Ed.2d 1128 (1978); *United States v. McGrath,* 558 F.2d 1102, 1107 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765 (1978). We also note that appellants can make no claim of surprise because the § 3500 material[8] included the grand jury testimony of the other Salmon partners which related almost entirely to the prior consistent statements.

■ Maultasch also argues that the district court erred in permitting Truen to testify on re-direct to Helman's prior consistent statements. The trial court proceeded, however, on the basis that Maultasch's counsel opened the door on cross-examination by asking Truen whether he and Helman had had discussions "concerning the Galaxy arrangements" before and after a meeting with appellants. We believe that Judge Frankel correctly admitted this evidence as to "precisely what those discussions were," the subject of the re-direct testimony. We therefore need not consider whether it was also admissible under Fed.R. Evid. 801(d)(1)(B) as a prior consistent statement.

## SUFFICIENCY OF THE EVIDENCE: THE TWO WITNESS RULE

■ Appellant Maultasch argues that under the two witness rule of perjury cases,[9] the evidence was insufficient to support his conviction for perjury on account of his statement that he had no beneficial interest in any customer accounts at Salmon. The Government counters that it is sufficient if two different witnesses each testify to a separate transaction—in this case the maintenance of Bernard Cohen's and Bernice Seidman's accounts—relying upon *United States v. Weiner,* 479 F.2d 923, 928 (2d Cir. 1973). *Weiner* stated that the rule in this circuit means no more than that the independent corroborating evidence "must tend to substantiate that part of the testimony of the principal prosecution witness which is material in showing that the statement made by the accused under oath was false," *id.* at 927–28; the court held that if a defendant denies *any* transactions, the Government satisfies the two witness rule if one witness testifies to one transaction and another witness to another transaction.

■ We hold that the Government satisfied the two witness rule through the testimony of Bernard Cohen and Bernice Seidman to two different transactions.[10] There is a "primary compliance" with the rule if "the second witness has given independent testimony of another, separate and distinct incident or transaction, which if believed, would prove that what the accused said under oath was false." *Id.* That is to say, it is wholly immaterial whether the second witness corroborates the first witness "in whole, in part or not at all." *Id.*

*United States v. Freedman,* 445 F.2d 1220, 1225–26 (2d Cir. 1971), is not to the contrary. *Freedman* did not involve two witnesses testifying to different transactions but one witness testifying to two transactions. The witness was corroborated as to one transaction but not the other; this court reversed the conviction because the trial judge had instructed the jury that it could convict solely on the basis of the

8. 18 U.S.C. § 3500, providing for Government production of statements and reports of witnesses.

9. *Weiler v. United States,* 323 U.S. 606, 607, 65 S.Ct. 548, 89 L.Ed. 495 (1945); *Hammer v. United States,* 271 U.S. 620, 626, 46 S.Ct. 603, 70 L.Ed. 1118 (1926). Technically, the "two witness" rule is a misnomer because the rule requires *either* the testimony of a second witness *or* other evidence of independent probative value, circumstantial or direct, that is "of a quality to assure that a guilty verdict is solidly founded." *United States v. Collins,* 272 F.2d 650, 652 (2d Cir. 1959), *cert. denied,* 362 U.S. 911, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960).

10. Per Judges Lumbard and Friendly. Judge Oakes decides only that on the facts of this case the Government satisfied the two witness rule as to each transaction, *see infra* in text, and would not reach the *Weiner* question.

uncorroborated transaction. Because the Government here relied on the testimony of two different witnesses, *Freedman* is not controlling.

In any event, there *was* sufficient evidence to meet the requirements of the two witness rule as to each transaction. Appellant Maultasch in fact appears to concede in his brief that the Government may have introduced sufficient proof of the Cohen transaction, a concession well advised in view of the letter agreement between appellants and Cohen as to the terms for financing their automobiles. There was also sufficient corroborative evidence of the Seidman transaction. Mrs. Seidman testified directly to the overall agreement by which Maultasch would use stock profits in an account in her name at Salmon to pay for clothing for his wife. There was corroborative proof that an account was opened in her name on November 22, 1971; that Maultasch gave Helman the names of persons to whose accounts Salmon should allocate the 3,000 shares of a new offering of Comfax stock remaining out of the 10,-000 offered to Maultasch after the purchase of 7,000 shares for the Fund; that 200 of those shares were purchased for Mrs. Seidman's account on December 2, 1971, at $7 per share and resold on December 6, 1971, at 20¼ per share for a $4,040 profit; that of the $4,040 check that Salmon mailed to Mrs. Seidman on December 20, 1971, $1,400 was the basis in the stock and $600 the anticipated tax, leaving approximately $2,000 for clothing purchases by Mrs. Maultasch and Mrs. Reddock; and that on December 8, 1971, two days after the profit was generated in Mrs. Seidman's account, Mrs. Maultasch bought $1,000 worth of clothing.

### ADMISSIBILITY OF EVIDENCE: SALMON'S STOCK MANIPULATIONS

■ Appellant Reddock argues that the court improperly admitted evidence of Salmon's stock manipulations. The method of Salmon's manipulations and the kind of stock involved ("hot" new issues that rose rapidly after issuance only to plummet rapidly), at least those manipulations as to which there was no proof of appellant's knowledge, he argues, were irrelevant as well as unduly prejudicial. Appellant's counsel objected to the testimony pertaining to Salmon manipulations but subsequently admitted that he intended to use "some of" the evidence to impeach the Salmon partners, key Government witnesses, and thus induced the court to admit the evidence that it was otherwise inclined not to admit.[11]

### SUFFICIENCY OF THE EVIDENCE: INTEREST IN CUSTOMER

■ Appellant Reddock argues that the Government failed to show that the Cohen and Seidman accounts were "nominee" accounts. But the technical characterization was never an issue. Reddock told the SEC interrogator that he did not "share in profits or losses" in any account; the Government sought to prove that he did. The argument concerning "nominee" accounts is not to the point.

Reddock also argues that the questions that the SEC interrogator posed to him were insufficiently precise. *See United States v. Slawik*, 548 F.2d 75, 86 (3d Cir. 1977); *cf. United States v. Bronston*, 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973) (literally correct but unresponsive and misleading answer cannot form basis for perjury conviction). But appellant's suggestion that because the interrogator did not specifically mention the Cohen and Seidman accounts they may have slipped appellant's mind is not convincing. Such accounts, by means of which both Maultasch and Red-

---

11. Defense counsel objected to Sheldon Salmon's testimony on direct, and the court ruled, "I don't think I am going to allow any of this business about the other stocks on the basis of what [the Assistant United States Attorney has] told me." Trial Transcript at 64. After defense counsel admitted that he intended to go into some of the evidence on cross-examination, the court overruled defense counsel's objection, stating that counsel could not "have it both ways." Tr. at 65.

dock financed high-priced automobiles and substantial clothing purchases, would not tend to slip one's mind as would, for example, the carrying of a notebook into an apartment, *see United States v. Razzaia,* 370 F.Supp. 577 (D.Conn.1973), the only case that appellant discusses at any length. Judge Frankel commented that these questions told appellant everything that he needed to know to avoid inadvertently giving a false answer. Reading the questions, notes 3 and 4 *supra,* we do not disagree.

Judgment affirmed.