**UNITED STATES of America, Appellee,**

v.

**Sam FORD and Barbara Belle,
Defendants-Appellants.**

**No. 872–3, Dockets 78–1355, 78–1416.**

United States Court of Appeals,
Second Circuit.

Argued April 30, 1979.

Decided July 6, 1979.

Milton S. Gould, New York City (Shea, Gould, Climenko & Casey, Dean G. Yuzek, New York City, of counsel), for defendant-appellant Sam Ford.

Arthur A. Munisteri, New York City (Benton L. Becker, Coral Gables, Fla., of counsel), for defendant-appellant Barbara Belle.

Mary Jo White, Asst. U. S. Atty., New York City (Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., David C. Patterson, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before LUMBARD, FRIENDLY and MULLIGAN, Circuit Judges.

LUMBARD, Circuit Judge:

Ford and Belle appeal their convictions for wire fraud, and in Ford's case, wire fraud and perjury, entered after a two-week jury trial before Judge MacMahon of the Southern District. Finding no error in the appellants' trial and conviction, we affirm.

Ford, Belle and three others were charged in a twenty-two count indictment, filed on March 2, 1978, with various offenses in connection with the sale of stock in Dimensional Entertainment Corporation (hereinafter Dimensional). Ford and Belle

were charged in count one with securities fraud, in counts three through eleven with mail fraud, in counts twelve through fourteen with wire fraud and in count fifteen with conspiracy to obstruct justice. Counts sixteen and seventeen charged Ford alone with perjury before the Securities and Exchange Commission and count eighteen charged Ford and Belle with perjury before the Grand Jury. The remaining counts named only Ford and Belle's three co-defendants, each of whom pleaded guilty before trial.

The trial of Ford and Belle commenced on September 11, 1978. At the close of its case, the government consented to the dismissal of counts five, six, nine, ten and eleven of the indictment. Subsequently, the jury found Ford and Belle guilty of wire fraud, as alleged in counts twelve through fourteen, convicted Ford on the perjury charge in count seventeen, and acquitted both defendants on the remaining counts. Ford received a sentence of five years' imprisonment and a $1,000 fine on each of counts twelve and fourteen, with the prison sentences to run concurrently and the fines to be cumulative. On count seventeen, Ford was sentenced to three years' additional imprisonment and an additional $2,000 fine. Belle was sentenced to two years' imprisonment on each of counts twelve through fourteen, to be served concurrently.

Viewed in the light most favorable to the government, the evidence at trial revealed an elaborate scheme to create a rigged market for trading in Dimensional stock. In the summer of 1975, Ford began to look for a publicly held "shell" corporation with the ostensible purpose of promoting investment in three-dimensional video entertainment programs. His search eventually turned up Wicker World, Inc., a semi-dormant furniture business which in form met the requirement of being publicly traded, though nearly all its stock was in fact under control of the company's founders.

Ford purchased Wicker World in September of 1975 and promptly installed Barbara Belle as President. The contract of sale required the company's original owners to return the bulk of their shares to the corporate treasury but allowed them to retain control over the company's business assets. Simultaneously with the sale, a forty-one to one stock dividend was declared which increased the number of outstanding shares to 996,000, almost all of which remained under Ford's control.

Ford's efforts to promote and sell the stock of Wicker World began shortly after he agreed to its purchase. A key figure in the sales campaign was Robert Maietta, a broker with the Minneapolis brokerage firm of Margolis & Co. Maietta, who testified for the government at trial, had assisted Ford in his initial search for a "shell" corporation. After Ford settled upon Wicker World, Maietta arranged a September, 1975 meeting in Minneapolis between Ford and Maietta's superiors at Margolis which led to the firm's purchase of 55,000 shares of Wicker World stock for $1.48 per share. At about the same time, Ford asked Maietta if he would attempt to sell some Wicker World stock privately to help Ford raise money for the company's as yet unpaid purchase price. Maietta agreed and promptly began to solicit purchases at $1.50 per share from various of his friends and clients in Minneapolis.

Ford visited Maietta again in Minneapolis in September of 1975. He explained that additional shares of Wicker World were available and urged Maietta to continue his private sales, offering to give him one share of stock for every two shares that he was able to sell. Maietta responded enthusiastically, selling substantial quantities of stock and also making purchases for his own account. Proceeds from these sales were in most instances deposited in either of two bank accounts that Ford had opened in Minneapolis, though on occasions when Ford was in Minneapolis Maietta turned over the sale proceeds directly. Maietta identified nearly $200,000 in deposits to Ford's Minneapolis accounts as a result of these stock sales.

In conjunction with his sales efforts through Margolis and Maietta, Ford under-

took a promotional campaign to stimulate interest in Wicker World, a first step in which was to rename the company Dimensional Entertainment Corporation. Within a week after his sale of 55,000 shares of stock to Margolis, Ford organized a series of nominee purchases to create the impression of nationwide interest in the company. Individuals from Florida, California and Texas purchased significant quantities of Wicker World or Dimensional stock, purportedly on their own behalf but actually with money supplied either directly or indirectly by Ford.

During the period that Wicker World/Dimensional stock was being traded, Ford also issued three press releases to herald alleged successes in the company's business and investment activities. One of these "successes" was the company's acquisition of production rights to an off-Broadway show that was characterized in a July 1976 release as "playing to good grosses." The release also mentioned the director who had allegedly been signed to direct the show on Broadway. In fact, however, the named individual never signed a contract with Dimensional, and the play itself was a consistent money-loser, kept in production largely because Ford subsidized part of its costs.

There were other misrepresentations as well. The releases referred to Dimensional's continuing progress with three-dimensional video entertainment programs when in fact the company's projects had been effectively ended by Ford's failure to provide the financing required under two development contracts. The July, 1976 release also noted Dimensional's acquisition of Vaughn Travel Company, which it termed a profitable business with prestigious clients. Vaughn Travel was nearly bankrupt at the time, however, and the purchase was actually designed to bolster Dimensional's balance sheet. A side agreement with one of Vaughn's co-owners required virtually all of the purchase price to be returned to Dimensional in exchange for two entertainment properties and thus enabled Dimensional to list additional income on its financial statement.

In the spring of 1976 Ford sought to escalate his sales campaign by making Dimensional stock available for public sale in Minneapolis. Since he wished at the same time to avoid the detailed registration requirements of Minnesota's blue sky laws, Ford attempted to list the company in Moody's Industrial Over the Counter Manual which would exempt the company from state registration. Listing in Moody's required an audited financial statement reflecting at least $100,000 in assets, and to meet that condition Ford enlisted the aid of his nephew Stephen Yordon, a Florida certified accountant. Yordon was able to prepare a financial statement showing Dimensional with $115,000 in assets, but to do so treated as income payments owed Dimensional under a dubious contract for the sale of a theatrical script. The supposed purchaser of the script was an entertainer named Lou Wills, and although the contract set a sale price of $75,000, Wills had not even read the script when he signed the agreement and was assured at the time by Belle that he would not have to make any payments unless he actually produced a show.

The contingent form of Wills' agreement with Dimensional caused one of Yordon's accounting partners to object to the financial statement's characterization of the contractual payments as income. To meet this objection, Ford and Belle arranged for two bogus telegrams to be sent from California under the name of Lew Wills Productions. The first was addressed to Belle in New York and purported to amend the contract for sale of the script by unconditionally obligating Wills to pay $40,000 of the $75,000 purchase price within the first year. The second telegram was sent to Yordon's accounting firm in Florida and confirmed that a telegram amending the contract had just been sent to Dimensional.

On the basis of the fictitious amendment to Wills' contract, Dimensional's financial statement was issued as originally prepared by Yordon, with the consequence that Dimensional gained listing in Moody's and its stock became available for public trading in

Minneapolis on June 1, 1976. On the same day over 60,000 shares of the stock traded, reflecting the interest stimulated by Ford's promotional efforts. Sales continued at a somewhat reduced level throughout the summer, the price rising to around $5.00 a share before the scheme collapsed following the SEC's suspension of all trading in early September of 1976.

■ Ford's first claim of error is that his conviction on counts twelve through fourteen for wire fraud and his simultaneous acquittal of the securities fraud alleged in count one violated the Double Jeopardy Clause of the Fifth Amendment. Despite its phrasing, the substance of Ford's complaint is that the jury rendered inconsistent verdicts. Even if the wire fraud and securities fraud counts were, as Ford alleges, multiplicious, no interest protected by the Double Jeopardy Clause is violated by Ford's simultaneous conviction and acquittal on those charges.[1]

■ If taken as an objection to an alleged inconsistency in the jury's verdict, Ford's claim, even if accurate, is squarely controlled by *United States v. Zane,* 495 F.2d 683, 690, *cert. denied,* 419 U.S. 895, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974), where we stated,

It is well settled that even plainly inconsistent jury verdicts, simultaneously rendered are the jury's prerogative. The rule, as announced by Judge Learned Hand in *Steckler v. United States,* 7 F.2d 59 (2d Cir. 1925), and confirmed by Justice Holmes in *Dunn v. United States,* 284 U.S. 390 [52 S.Ct. 189, 76 L.Ed. 520] (1932), is that consistency in jury verdicts is not required. That the rule retains all its vitality today is evident from our steadfast adherence to it.

■ Ford's second claim, joined in by Belle, is that the evidence failed to establish that the telegram on which count twelve of

the indictment was based was sent in furtherance of the scheme to defraud. The telegram in question was, as described above, sent from California and addressed to Barbara Belle in New York. It was signed "Lew Wills Productions" and purported to amend Wills' contract with Dimensional so as to bind him unconditionally to pay $40,000 within one year, an amendment necessary to bring Dimensional's financial statement in line with the requirements for listing in Moody's. Ford and Belle argue that since a separate telegram had been sent to Yordon's accounting firm in Florida informing it of Wills' supposed amendment of the contract, the count twelve telegram was superfluous and not an element of the scheme to defraud. Ford's and Belle's argument, however, clearly makes too much of the "in furtherance" requirement. To prove that interstate wire facilities were used in furtherance of a fraudulent scheme the government must show not that the wire transmission was an essential element, *Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954) but simply that it was for the purpose of executing the scheme. *United States v. Maze,* 414 U.S. 395, 400, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974). This the government surely did in the instant case, or at least so the jury was entitled to find, since the count twelve telegram was the foundation for the fraudulent telegram sent to Yordon's accounting firm, serving to substantiate the fiction that Wills by direct communication with Dimensional had agreed to the contract amendment.

Ford and Belle also argue that the government failed to prove the interstate wire transmissions cited in counts thirteen and fourteen of the indictment. The government at trial argued that the transmissions were made in connection with Ford and Belle's transfer of funds from their account at the Sterling National Bank

---

1. The Double Jeopardy Clause of the Fifth Amendment has been held to embrace three separate constitutional protections. It protects against 1) a second prosecution for the same offense after acquittal; 2) a second prosecution for the same offense after conviction; and 3) multiple punishments for the same offense. *Brown v. Ohio,* 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), citing *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969). None of these is implicated in Ford's case.

# 1048 ▇▇▇▇▇▇▇▇▇▇

in New York to a California bank account of the Vaughn Travel Company. Ford and Belle do not contest that such a transfer was made nor that the jury could find it to have been made in furtherance of the fraudulent scheme. They argue instead that no evidence at trial established that the funds were in fact wired from New York to California and not transferred in some other way.

▇▇▇▇ Although it is clear that more definite proof regarding transfer of the funds by wire must have been available to the government, it is not necessarily error for the government to rely on circumstantial evidence of less persuasive value, provided such proof is sufficient so that the jury may find beyond a reasonable doubt that the transfer was by wire. On all the evidence in the record, we find that there was sufficient evidence to support the jury's finding.

Thomas Printon, an officer at Sterling National in Manhattan, testified that Sterling's usual practice in effecting interstate transfers was to wire the funds to its correspondent bank, Manufacturers Hanover in New York, for retransmission to the ultimate destination. Based upon records of Dimensional's account at Sterling, Printon was able to say with regard to the two transfers in question that they were "wired from the Sterling National Bank."

Although Printon's testimony traces the funds only as far as the wire room at Manufacturers Hanover in New York, and, by itself, provides no direct evidence as to whether Manufacturers subsequently made the interstate wire transmissions charged in counts thirteen and fourteen, there was other evidence bearing at least inferentially on Manufacturers' handling of the funds. Specifically, the government introduced at trial documents indicating that on at least one subsequent occasion Manufacturers Hanover wired funds in effecting a transfer from Ford's account at Sterling National to

a California bank.[2] Absent evidence as to some other likely form of transfer, we believe this evidence of Manufacturers Hanover's normal practice in relaying funds from Sterling National to west coast banks provided sufficient basis for the jury to conclude beyond a reasonable doubt that Manufacturers Hanover employed wire transmissions with respect to the transfers cited in counts thirteen and fourteen.

Ford also challenges the sufficiency of the evidence supporting his conviction for perjury before the SEC. The substance of Ford's allegedly perjurious testimony, which is set out in full below, was that after his sale and delivery of 55,000 shares of stock to Margolis & Co., he had not on any occasion delivered additional shares of Wicker World or Dimensional stock to individuals in Minneapolis.

"Q. Other than the 55,000 shares of stock that you—the 42,000 that you delivered into Margolis and the 13,000 shares that were delivered in on your behalf, do you have any knowledge of any other shares that you gave Maietta?

A. I didn't give him anything. You mean Wicker—

Q. Wicker or Dimensional?

A. No.

Q. Never gave Maietta or anybody else in Minneapolis any—

A. Absolutely not.

Q. (Continuing)—any other shares—

A. Absolutely not.

Q. (Continuing)—let me finish the question—of Dimensional or Wicker World?

A. Yes, I understood the question. Wicker or Dimensional. The answer is no.

Q. I want the question to be one sentence, all right, and please give your answer.

Did there ever come a time, Mr. Ford, from 1970, from the time you delivered

**2.** The government also introduced records of another instance in which a transfer from Ford's account at Sterling National to a California bank was effected by interstate wire. Although the correspondent bank on this occasion was Chase Manhattan and not Manufacturers Hanover, the evidence supports the common sense inference that transfers of this sort are made by wire.

your shares of 42,000 shares to Margolis for sale to today, when you gave Maietta or anybody else in Minneapolis or delivered to Maietta or anybody else in Minneapolis any other shares of Wicker World or Dimensional Entertainment?

A. To the best of my recollection, no.

Ford argues that his testimony was only that he never "personally gave or delivered" additional stock to people in Minneapolis, and that the SEC examiner's questions were impermissibly vague if interpreted as also asking whether he caused or directed such deliveries to be made. Absent fundamental ambiguity or impreciseness, however, the meaning of the examiner's questions and Ford's answers were for the jury, and they were free to consider the words' "natural meaning in the context in which [they] were used." *United States v. Bonacorsa,* 528 F.2d 1218, 1221 (2d Cir.), *cert. denied,* 426 U.S. 935, 96 S.Ct. 2647, 49 L.Ed.2d 386 (1976). As a sophisticated trader and promoter of stock, Ford surely knew that the examiner's questions were concerned with the source of Dimensional stock placed in the Minneapolis market, and not with distinctions between personal and direct delivery. Taken as asking whether Ford was responsible for the delivery of additional shares to persons in Minneapolis, the SEC examiner's questions were not fundamentally ambiguous or imprecise; they clearly told Ford "everything that he needed to know to avoid inadvertently giving a false answer." *United States v. Maultasch,* 596 F.2d 19, 27 (2d Cir. 1979).

■ Stripped of Ford's narrow construction of the SEC examiner's questions, Ford's claim that there was insufficient evidence supporting his perjury conviction is wholly without merit. Under the so-called "two-witness" rule, testimony indicating that a defendant perjured himself must be corroborated either by the testimony of a second witness or by other evidence of independent probative value, circumstantial or direct, of sufficient quality to assure that a guilty verdict is solidly founded. *United States v. Maultasch, supra,* at 25 n. 9. The government's primary witness as to Ford's

perjury was Maietta, who testified that after Ford's delivery of the 55,000 shares to Margolis he on numerous occasions sold Dimensional stock supplied by Ford and then deposited the proceeds in Ford's accounts. To corroborate that Ford had in fact sold Dimensional stock in Minneapolis through Maietta, the government offered as evidence the testimony of individual purchasers, checks from those purchasers made out to Ford and deposited in his account, and Dimensional's shareholders' ledger reflecting the transactions. In light of this evidence, we have no reason to doubt that Ford's perjury conviction rests on a solid foundation.

We have reviewed the appellant's other arguments and we find them to be without merit.

Affirmed.