**UNITED STATES of America, Appellee,**

v.

**Robert CHESTMAN,
Defendant–Appellant.**

**No. 309, Docket 89–1276.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 1, 1989.

Decided May 2, 1990.

Elkan Abramowitz, New York City (Alan J. Brudner, Obermaier, Morvillo & Abramowitz, P.C., New York City, of counsel), for defendant-appellant.

E. Scott Gilbert, Asst. U.S. Atty., New York City (Benito Romano, U.S. Atty. for S.D.N.Y., David E. Brodsky, Asst. U.S. Atty., New York City, and Daniel L. Goelzer, Gen. Counsel, Richard A. Kirby, Sr. Litigation Counsel, Andrew S. Bennett, Atty., S.E.C. Washington, D.C., of counsel), for appellee.

Before MINER and MAHONEY, Circuit Judges, and CARMAN, Judge.*

MINER, Circuit Judge:

Defendant-appellant Robert Chestman appeals from a judgment of conviction entered May 9, 1989, after a jury trial, in the United States District Court for the Southern District of New York (Walker, *J.*). Chestman was convicted of ten counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) ("section 10(b)"), 78ff (1988), 18 U.S.C. § 2 (1988), and 17 C.F.R. § 240.10b–5 (1988) ("rule 10b–5"); ten counts of fraudulent trading in connection with a tender offer in violation of 15 U.S.C. §§ 78n(e) ("section 14(e)"), 78ff, 18 U.S.C. § 2, and 17 C.F.R. § 240.14e–3 ("rule 14e–3"); ten counts of mail fraud in violation of 18 U.S.C. §§ 1341, 2; and one count of perjury in violation of 18 U.S.C. § 1621.

On appeal Chestman contends that 1) the government failed to prove either a misappropriation of nonpublic information or the existence of a relationship of trust and confidence sufficient to establish the requisite duty under rule 10b–5; 2) the mail

---

* Hon. Gregory W. Carman, Judge of the United States Court of International Trade, sitting by designation.

fraud conviction must be reversed because the alleged victims lacked a cognizable property interest; 3) his perjury conviction was not supported by sufficient evidence; and 4) his conviction under rule 14e–3 was improper because the Securities and Exchange Commission (SEC) exceeded its rulemaking authority in promulgating the rule.

The judgment of conviction is reversed for the reasons that follow.

## BACKGROUND

Robert Chestman was a stockbroker and financial advisor for the brokerage house of Gruntal & Co. (Gruntal). In 1982 Chestman met with Keith Loeb to discuss Loeb's transfer of various brokerage accounts to Gruntal with the aim of consolidating his accounts, specifically his holdings in Waldbaum, Inc. (Waldbaum), a public company with shares trading in the over-the-counter market. At that time, Loeb indicated that his wife, Susan, was the niece of Ira Waldbaum, the president and controlling shareholder of Waldbaum. Ira and his immediate family owned approximately 51% of the outstanding Waldbaum stock. Ira's sister, Shirley Witkin, owned a large block of the stock of Waldbaum, and her children, including Susan Loeb, owned less than 1%. During the course of Chestman's relationship with Loeb, Chestman executed for him several transactions involving Waldbaum restricted and common stock. In order to facilitate some of the trades, Loeb had to send Chestman a copy of his wife's birth certificate, which indicated that Susan Loeb was the daughter of Shirley Waldbaum Witkin.

In November 1986, Ira Waldbaum entered into negotiations for the sale of Waldbaum to the Great Atlantic and Pacific Tea Company, Inc. (A & P). A & P and Waldbaum executed a stock purchase agreement on November 21 requiring Ira, as attorney-in-fact for the Waldbaum family stockholders, to tender a controlling block of Waldbaum shares to A & P in exchange for payment of $50 per share. Ira told Shirley he would tender her shares as part of the sale to enable her to avoid the administra-tive problems of tendering after the public announcement. He also cautioned her "that [it was] not to be discussed" and was to remain confidential. She turned the stock over to Ira on November 24.

Susan Loeb became concerned when she could not locate her mother at home on the morning of November 24. When she spoke to her mother later that day, her mother revealed that she had gone out to turn the shares over to Ira. Mrs. Witkin told her daughter about the impending sale and stated that "it was very important that [she] didn't tell anybody about it because it could ruin the sale. And that financially it was going to be a beneficial thing." She further told Susan not to tell anyone except her husband. The next day, Susan told her husband about the sale and admonished him not to tell anyone because "it could possibly ruin the sale."

On November 26, Keith Loeb telephoned Chestman at 8:58 a.m. but was unable to contact him. The call from Loeb and the message "asap" was recorded on a message slip. Loeb testified that he spoke to Chestman by telephone from his factory in New Jersey sometime between 9 a.m. and 10:30 a.m., when he left for his office in New York City. Loeb told Chestman that he "had some definite, some accurate information" that Waldbaum was being sold at a "substantially higher" price than the market value of its stock. Loeb "asked [Chestman] what he thought I should do" with the information, but Chestman refused to give him a definite answer.

At 9:49 a.m. Chestman purchased 3000 shares of Waldbaum for himself at $24.65 per share. Between 11:31 a.m. and 12:35 p.m. Chestman purchased a total of 8000 shares for his discretionary accounts at prices ranging between $25.75 and $26.00 per share. Included in these purchases were 1000 shares for the Loeb account. He recorded all the discretionary account trades on his desk blotter but did not write Loeb's name next to the trade for the Loeb account.

Loeb testified that he again contacted Chestman before 4:00 p.m. and ordered the purchase of 1000 shares. Chestman denied

having spoken to Loeb before 9:49 a.m. and did not recall an order from Loeb later in the afternoon. Chestman's administrative assistant testified that Loeb called around 9 or 10 a.m., that he called a second time in the "late morning" or "early afternoon," and that, as of the second call, Loeb still had not spoken to Chestman.

The tender offer was announced at the close of trading on November 26, and the price of Waldbaum shares rose to $49.00 on the next trading day. On the following Saturday, Loeb received the confirmation slip, feigning surprise about the purchase in the presence of his wife.

In December, Keith Loeb learned that the National Association of Securities Dealers had commenced an investigation into the Waldbaum transactions. Loeb contacted Chestman who, according to Loeb, attempted to quell his fears. Chestman claimed he bought the stock for Loeb based upon research. Thereafter, Chestman allegedly asked Loeb about his "position," and Loeb stated "I guess it's the same thing."

On April 3, 1987, Loeb learned he was likely to be subpoenaed by the SEC. Loeb immediately contacted Chestman, who again stated that he bought the stock on the basis of his research. A similar conversation occurred on April 7. Loeb eventually entered into a cooperation agreement with the government by the terms of which he disgorged profits from 1000 shares and paid an additional fine.

Chestman appeared before the SEC in connection with the investigation on April 15, 1987. He testified that he did not recall speaking with Loeb on the morning of November 26 or receiving inside information. . He asserted that the purchases of November 26 were the product of research, consistent with his previous purchases of Waldbaum and other retail food stocks and in accord with reports in trade publications and the unusually high trading volume of the stock on November 25.

At trial, Chestman maintained the position he had taken before the SEC. The jury convicted Chestman of ten counts of securities fraud, in violation of section 10(b) and rule 10b–5; ten counts of mail fraud; ten counts of fraud in connection with a tender offer under section 14(e) and rule 14e–3; and one count of perjury in connection with his testimony before the SEC.

## DISCUSSION

### I. Securities Fraud

Chestman was convicted on 10 counts charging him with violations of section 10(b) and rule 10b–5. With regard to the 1000 shares purchased on behalf of Keith Loeb, Chestman was convicted in Count 2 of aiding and abetting Loeb in misappropriating material non-public information in breach of Loeb's duty to the Waldbaum family. With regard to the purchases he made for himself and customers other than Loeb, Chestman was convicted on the remaining 9 counts for trading as a "tippee" of the same material non-public information purportedly appropriated by Loeb in breach of the duty of trust and confidence by which he was bound.

Rule 10b–5, promulgated pursuant to the rulemaking authority delegated under section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), makes it "unlawful for any person ... [t]o engage in any act ... which operates ... as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5 (1988). Fraudulent securities practices of all kinds are encompassed by the rule, *see Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), which must be construed "not technically and restrictively, but flexibly to effectuate its remedial purposes." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972) (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963)). Included in the prohibited practices is the misappropriation of "valuable non-public information entrusted to [a person] in the utmost confidence." *SEC v. Materia*, 745 F.2d 197, 201 (2d Cir.1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985) (quoting *Chiarella v.*

*United States,* 445 U.S. 222, 245, 100 S.Ct. 1108, 1123, 63 L.Ed.2d 348 (1980) (Burger, C.J., dissenting)). "[T]he [misappropriation] theory premises liability on a party's deception of those who have given him privileged access to confidential information." Aldave, *Misappropriation: A General Theory of Liability for Trading on Nonpublic Information,* 13 Hofstra L.Rev. 101, 124 (1984).

Persons having access to confidential information by reason of various types of special relationships with information sources have been convicted of securities fraud under the misappropriation theory. *See, e.g., United States v. Grossman,* 843 F.2d 78 (2d Cir.1988) (member of law firm); *Materia,* 745 F.2d 197 (employee of printing establishment); *United States v. Newman,* 664 F.2d 12 (2d Cir.1981) (employees of investment banks), *aff'd after remand,* 722 F.2d 729, *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983); *United States v. Carpenter,* 791 F.2d 1024 (2d Cir.1986), *aff'd,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987) (financial columnist); *SEC v. Musella,* 578 F.Supp. 425 (S.D.N.Y. 1984) (manager of office services for law firm); *cf. United States v. Reed,* 601 F.Supp. 685 (S.D.N.Y.), *rev'd on other grounds,* 773 F.2d 477 (2d Cir.1985) (son of corporate director).

■ The aiding and abetting count here requires proof that Keith Loeb, in breach of a special relationship of trust, misappropriated valuable non-public information acquired by him in confidence; that Chestman voluntarily acted to assist him in the misappropriation; and that Chestman furnished the assistance with the specific intent to bring about this variety of securities fraud. *See United States v. Aiello,* 864 F.2d 257, 262–63 (2d Cir.1988); *United States v. Wiley,* 846 F.2d 150, 154 (2d Cir. 1988).

■ The count charging Chestman as a tippee requires proof that Keith Loeb, the tipper, furnished the misappropriated information regarding the Waldbaum sale to Chestman as tippee. *See Carpenter,* 791 F.2d at 1032; 5A A. Jacobs, *Litigation and Practice Under Rule 10b–5*

§ 66.02[a][iii][F], at 3–494.32 to .33 (1989); *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 313 n. 22, 105 S.Ct. 2622, 2630 n. 22, 86 L.Ed.2d 215 (1985). A tippee is held to assume the liability of his tipper upon a showing of: a duty owed by the tipper; a breach of that duty by the tipper; and knowledge of the breach by the tippee. *Dirks v. SEC,* 463 U.S. 646, 660, 103 S.Ct. 3255, 3264, 77 L.Ed.2d 911 (1983); 15 U.S.C. § 78ff(a).

■ Evidence that Keith Loeb revealed the critical information in breach of a duty of trust and confidence known to Chestman is essential to the imposition of liability upon Chestman as aider/abettor, *Materia,* 745 F.2d at 201, or as tippee, *Dirks,* 463 U.S. at 660. Such evidence is lacking here. Although Chestman was aware that Loeb was a member of the Waldbaum family and may well have gathered that the "definite" and "accurate" information furnished by Loeb was not generally available, there simply is no evidence that he knew that Loeb was breaching a confidential relationship by imparting the information to him. The government can point to nothing in the record demonstrating actual or constructive knowledge on the part of Chestman that Keith Loeb was pledged to secrecy by Susan Loeb, who was pledged to secrecy by Shirley Witkin, who was pledged to secrecy by Ira Waldbaum. Loeb testified on direct examination that he could not recall describing the information as confidential, and there is no evidence that he ever alluded to the source of his information. *Cf. Materia,* 745 F.2d at 202. It is impossible to attribute knowledge of confidentiality to Chestman in view of the attenuated passage of the information and in the absence of any showing that the information retained any kind of confidentiality in the hands of Keith Loeb.

Even assuming knowledge of Loeb's duty of confidentiality on the part of Chestman, there is no demonstration of the acceptance of that duty by Loeb. There is presented here a chain of relationships, each link purportedly representing a pledge of trust and confidence. But there is no showing of any assurance, express or im-

plied, by any of those to whom the information was confided, that confidentiality would be maintained. *See Walton v. Morgan Stanley & Co.*, 623 F.2d 796, 799 (2d Cir.1980). Without more, such as a course of dealing, a family relationship alone cannot carry an implied promise that confidences of this kind will be maintained. *Compare Reed*, 601 F.Supp. at 706 & n. 32.

In *Reed*, relied upon by the government, the defendant was the son of a corporate director who traded on nonpublic information, given to him by his father, about a pending merger between the father's company and another corporation. *Id.* at 690. The defendant sought to dismiss specific counts of the indictment, arguing that the government could not sustain its burden of establishing a relationship of trust and confidence. *Id.* at 705. The district court determined that the issue was for the jury and denied defendant's motion. *Id.* at 717–18. A distinguishing factor in *Reed* is that the father had disclosed information involving affairs of the corporation on several occasions. *Id.* at 705. There is no evidence that the members of the Waldbaum family had a history of reposing business confidences in one another.

The securities fraud convictions are reversed.

## II. Mail Fraud

The mail fraud statute prohibits the use of the mails for the purpose of executing "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses." 18 U.S.C. § 1341. The "property" referred to in the statute includes such intangible property as confidential, non-public business information. *Carpenter*, 484 U.S. at 26, 108 S.Ct. at 324. Various schemes to misappropriate such information have served as the bases for convictions under the mail fraud statute. *See, e.g., United States v. Kent*, 608 F.2d 542, 545 (5th Cir.1979), *cert. denied*, 446 U.S. 936, 100 S.Ct. 2153, 64 L.Ed.2d 788 (1980); *United States v. Louderman*, 576 F.2d 1383, 1387 (9th Cir.), *cert. denied*, 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978).

In the case at bar, Chestman was charged with misappropriating information about the sale of Waldbaum to A & P as part of the fraudulent scheme engaged in with Loeb to defraud the members of the Waldbaum family. In his defense, Chestman contends that the information was merely "family gossip" when Susan Loeb received it and that it therefore was not "property" when obtained. Chestman also contends that Susan was the only possible target of the alleged mail fraud but could not be defrauded because she lacked any cognizable interest in the property.

There can be no misappropriation of information by one who is unaware of the confidentiality of that information. *See Carpenter*, 484 U.S. at 26, 108 S.Ct. at 324. As previously noted, there is no basis for a determination that Chestman had the requisite knowledge. Chestman merely was informed by Keith Loeb that Waldbaum was being sold at a price higher than the market value of the stock. It cannot be inferred that Chestman had constructive knowledge of the confidentiality of this information simply because he knew Loeb's wife to be a member of the Waldbaum family. After passing through several family channels, it cannot be said that the information was confidential to any degree or was any more than "family gossip."

The mail fraud convictions cannot be sustained, and they are reversed.

## III. Perjury

The indictment charged Chestman with giving false testimony in denying that he 1) spoke to Loeb before purchasing Waldbaum shares for himself; 2) spoke to Loeb before purchasing 1000 shares for Loeb's account; 3) received confidential information from Loeb concerning the sale of Waldbaum; and 4) attempted to effect a cover-up regarding the events of November 26, 1986. The sufficiency of proof regarding each of these allegations is discussed in turn.

The undisputed "rule in prosecutions for perjury is that the uncorroborated oath of one witness is not enough to establish the

falsity of the testimony of the accused set forth in the indictment. . . ." *Hammer v. United States*, 271 U.S. 620, 626, 46 S.Ct. 603, 604, 70 L.Ed. 1118 (1926). The "two-witness" rule requires that the alleged perjurious statement be established either by the testimony of two independent witnesses or by one witness and corroborating evidence that is " 'inconsistent with the innocence of the [defendant].' " *United States v. Weiner*, 479 F.2d 923, 926 (2d Cir.1973) (quoting *United States v. Hiss*, 185 F.2d 822, 824 (2d Cir.1950), *cert. denied*, 340 U.S. 948, 71 S.Ct. 532, 95 L.Ed. 683 (1951)).

■ The indictment charged, in part, that Chestman falsely testified at the SEC hearing when he stated that he had not spoken to Loeb prior to the purchase of Waldbaum stock for himself. The order for the stock was placed at 9:49 a.m. At trial, Loeb testified that he spoke to Chestman prior to 10:30 a.m. The government's focus on the sufficiency of the corroborative evidence disregards an essential element under the two-witness rule—the testimony of at least one witness that purports to establish the falsity of the accused's testimony. In the case at bar, the independent witness, Loeb, was unable to pinpoint when he spoke to Chestman. At best, Loeb placed the conversation as occurring sometime prior to 10:30 a.m. Regardless of the sufficiency of the proffered corroborative evidence, there is simply no testimony from Loeb that he spoke to Chestman prior to 9:49 a.m. In the absence of testimony from at least one witness placing the conversation prior to 9:49 a.m., the perjury conviction cannot be sustained as to that conversation.

■ As to the remaining allegations of the perjury count as they relate to the events of November 26, Loeb's testimony that he spoke to Chestman prior to 10:30 a.m. would be sufficient, if supported by corroborative evidence, to sustain a perjury conviction. We therefore examine the sufficiency of the corroborative evidence proffered by the government in support of Loeb's testimony.

In assessing the sufficiency of the corroborative evidence, two elements are considered: "1) that the evidence, if true, substantiates the testimony of a single witness who has sworn to the falsity of the alleged perjurious statement; 2) that the corroborative evidence is, trustworthy." *Weiler v. United States*, 323 U.S. 606, 610, 65 S.Ct. 548, 550, 89 L.Ed. 495 (1945). While the independent evidence must be inconsistent with the innocence of the accused, it need only "tend to substantiate that part of the testimony of the principal prosecution witness which is material in showing" the accused's statement is false. *Weiner*, 479 F.2d at 927–28.

The corroborative evidence relied on by the government is wholly insufficient to satisfy the two-witness rule. For instance, the phone message at 8:58 a.m. merely establishes that Loeb attempted to contact Chestman and that Chestman was not in his office. Thus, it is equally supportive of Chestman's contention that he did not speak to Loeb on the morning of November 26. It does not establish that Chestman returned Loeb's call prior to 10:30 a.m. Chestman's position is buttressed further by the testimony of his administrative assistant. She testified that Loeb called between 9 and 10 a.m. and then again in the late morning or early afternoon. She noted that as of the time of the second phone call Loeb had not yet spoken to Chestman. The theory put forth by the government that stockbrokers always return calls by virtue of the nature of their business requires a presumption we do not care to adopt in the context of a perjury charge.

While the government also highlights the fact that Chestman's blotter notes omitted reference to the Loeb trade, we are unconvinced that this provides adequate proof that Chestman spoke to Loeb prior to execution of the trades. These notations were made solely for Chestman's personal use. As an experienced stockbroker, he certainly realized that the Loeb trade could not be concealed because it would be memorialized by the order and subsequent confirmation slip. Under these circumstances, the blotter omissions cannot serve as corroboration.

The government also would have this Court rely on the propitious timing of the trade as sufficient support for Loeb's testimony. Sole reliance on the timing of the trade would nullify the purpose of the two-witness rule. We recognize that the circumstances surrounding an alleged perjurious statement may constitute better corroborative evidence than oral testimony. *Hammer*, 271 U.S. at 627, 46 S.Ct. at 604. When a jury relies on circumstantial evidence, however, it must be demonstrated that this evidence has "independent probative value" if "standing alone." *United States v. Freedman*, 445 F.2d 1220, 1226 (2d Cir.1971). The timing of the trade here does not meet the standard. The fact that Chestman bought Waldbaum stock prior to the announcement of the tender offer is consistent with Chestman's position that he researched the company, assumed it was a takeover target, and invested accordingly. Standing alone, the timing of the trade does not have sufficient independent probative value to support the Loeb testimony at odds with that position. *See Freedman*, 445 F.2d at 1226.

In attempting to prove that Chestman testified falsely about the existence of a cover-up, the government placed special importance on a conversation between Chestman and James Spingarn, Gruntal's senior vice president in charge of compliance. Spingarn interviewed Chestman in December 1986 concerning the Waldbaum stock purchases. Essentially, Chestman assured him that there was no impropriety surrounding the purchases, and he noted the relatively small position he had taken in Waldbaum stock. Loeb testified regarding a similar conversation with Chestman. We are perplexed by the government's reliance on these conversations, because they are consistent with Chestman's position that he did not attempt to effectuate a cover-up of the events of November 26. Chestman does not deny speaking to Loeb after the 26th to "allay [Loeb's] fears" about the investigation. The fact that he had given Spingarn the same explanation he gave to Loeb adds no independent corroboration of cover-up perjury.

Finally, one of the allegedly false declarations giving rise to the perjury conviction was Chestman's denial that he was told by Keith Loeb that Loeb "had confidential information concerning Waldbaum." With regard to this declaration, it is sufficient to highlight the fact that Loeb could not "recall specifically using the word 'confidentiality'" when he spoke to Chestman on November 26. Therefore, the government could not present even one witness who could establish that Chestman was alerted to the confidential nature of the information.

After careful review, we find the evidence insufficient to sustain the conviction. Accordingly, we reverse Chestman's conviction for perjury.

### IV. Rule 14e–3

Section 14(e) of the Securities Exchange Act, enacted in 1968, makes it unlawful for any person "to engage in any fraudulent, deceptive, or manipulative acts or practices" in connection with a tender offer. 15 U.S.C. § 78n(e). The section was amended in 1970 to provide that "[t]he [Securities and Exchange] Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative." *Id.*

The Williams Act, which added section 14(e) to the securities law, was adopted for the protection of "investors who are confronted with a tender offer." *Piper v. Chris–Craft Indus.*, 430 U.S. 1, 35, 97 S.Ct. 926, 946, 51 L.Ed.2d 124 (1977). According to the Supreme Court, the 1970 amendment was designed to "provide[ ] a mechanism for defining and guarding against those acts and practices which involve material misrepresentation or non-disclosure. The amendment gives the [SEC] latitude to regulate nondeceptive activities as a 'reasonably designed' means of preventing manipulative acts...." *Schreiber v. Burlington Northern, Inc.*, 472 U.S. 1, 11 n. 11, 105 S.Ct. 2458, 2464 n. 11, 86 L.Ed.2d 1 (1985) (quoting section 14(e)). By enacting section 14(e), Congress sought to ensure that

all investors confronted with a tender offer would have access to information pertinent to making an informed decision. *Id.* at 11–12, 105 S.Ct. at 2464. "All three species of misconduct [specified in section 14(e)], i.e., 'fraudulent, deceptive, or manipulative' ... are directed at failures to disclose." *Id.* at 8, 105 S.Ct. at 2462.

Acting under the authority of the 1970 amendment, the SEC in 1980 adopted rule 14e–3, which defines as "a fraudulent, deceptive or manipulative act" the purchase or sale of a security by one "who is in possession of material information relating to [a] tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly" from the issuer, an officer, or any person acting on the issuer's behalf. 17 C.F.R. § 240.14e–3(a).

Chestman's challenge to his convictions for fraudulent trading in connection with a tender offer is grounded upon his claim that the SEC exceeded its rulemaking authority under section 14(e) when it adopted rule 14e–3 in its present form. Specifically, Chestman asserts that the rule improperly imposes liability: in the absence of either a duty to disclose or a fiduciary duty; for trading while in the possession of material nonpublic information, whether or not such information is used in effecting the transaction; and on the basis of a "quasi-negligence standard."

Rules and regulations adopted by an administrative agency pursuant to authority expressly conferred upon the agency by Congress are said to have "legislative effect" and are therefore "entitled to more than mere deference or weight." *Batterton v. Francis*, 432 U.S. 416, 425, 426, 97 S.Ct. 2399, 2405, 2406, 53 L.Ed.2d 448 (1977). The only rules that may be rejected are those "inconsistent with the statutory mandate or that frustrate" congressional policy. *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981). Rule 14e–3, however, is consistent with the congressional goal of protecting investors in the tender offer context, and

the specific challenge put forward by Chestman must be rejected.

Chestman relies substantially on a statement in *Schreiber*, 472 U.S. at 10, 105 S.Ct. at 2463, that section 14(e) added a broad anti-fraud provision modeled after section 10(b) and rule 10b–5. He therefore contends that rule 14e–3 should impose liability only when a fiduciary duty or confidential relationship exists. *See Chiarella*, 445 U.S. at 232, 100 S.Ct. at 1116. But rule 14e–3 imposes a duty to disclose or abstain from trading, in the context of a tender offer, on the part of any person in possession of material, nonpublic information obtained from an insider. A fiduciary duty or confidential relationship is not required. The rule achieves the purpose of Congress by ensuring through disclosure that shareholders have adequate information to assess relevant facts before deciding to tender their shares. *Schreiber*, 472 U.S. at 12, 105 S.Ct. at 2464. Consistent with this emphasis on disclosure, rule 14e–3 focuses on the acts of the issuer, offeror or any person who has material nonpublic information acquired directly or indirectly from the issuer in connection with a tender offer. 17 C.F.R. § 240.14e–3.

While the Supreme Court noted that section 14(e) was modeled after section 10(b), it emphasized that section 14(e) requires disclosure "more explicitly addressed to the tender offer context than that required by § 10(b)." *Schreiber*, 472 U.S. at 11, 105 S.Ct. at 2464. Rule 14e–3 was adopted under the authority of a broad congressional mandate to prescribe all "means reasonably designed" to prevent manipulative acts, including the regulation of nondeceptive activities. It is the congressional emphasis on disclosure in the tender offer setting that permits such regulation and which distinguishes the rulemaking power under section 14(e) from the rulemaking power under section 10(b). Moreover, congressional approval of the Insider Trading Sanctions Act of 1984, providing treble damages for rule 14e–3 violations, suggests congressional acceptance of the rule as promulgated by the SEC. *See* H.R.Rep. No. 355, 98 Cong. 1st Sess. 13 n. 20 (1983),

*reprinted in* 1984 U.S.Code Cong. & Admin.News 2274, 2286 n. 20.

Chestman's contention that rule 14e–3 is invalid because it proscribes trading while in "mere possession" of inside information, rather than actual use of the information, finds no support in the rule itself. First, the rule requires more than mere possession; it requires that the trader know, or have reason to know, that the information is material and nonpublic *and* derives directly or indirectly from an insider. *See* 17 C.F.R. § 240.14e–3(a). Second, in light of the broad rulemaking authority granted to the SEC to protect investors confronted by a tender offer, it would weaken the potency of this grant of authority to require actual proof of reliance. Trading, with the requisite knowledge, is sufficient.

As to Chestman's contention that the "know or have reason to know" language of the rule imposes a quasi-negligence standard, it is sufficient to observe that the district judge charged the jury that a conviction for violating the rule required a finding that Chestman acted "knowingly and willfully." The district court determined that the *mens rea* required was that established in section 32(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78ff(a), which requires willful misconduct. Accordingly, the jury was instructed that actual knowledge and willful misconduct were required. *See United States v. Dixon*, 536 F.2d 1388, 1395 (2d Cir.1976). The district court here made it clear to the jury that there could be no conviction if Chestman's conduct resulted from "innocent mistakes, negligence or inadvertence or other innocent conduct."

I would affirm the judgment of conviction as to the rule 14e–3 counts.

## CONCLUSION

In view of the foregoing, and of the separate opinions filed herewith, the judgment appealed from is reversed in all respects. The mandate shall issue forthwith.

MAHONEY, Circuit Judge and CARMAN, J., join in all but Part IV of this opinion, as to which each files a separate opinion.

MAHONEY, Circuit Judge, concurring in part and dissenting in part:

I agree with Parts I, II and III of Judge Miner's opinion for the court, reversing Chestman's securities fraud, mail fraud and perjury convictions. As to Part IV, however, while I agree that the district court's charge required a finding that Chestman acted "knowingly and wilfully," negating Chestman's contention that the jury might have convicted him for merely negligent violations of rule 14e–3, I conclude that the Securities and Exchange Commission (the "Commission") exceeded its statutorily granted authority by promulgating rule 14e–3 without including any requirement of a breach of fiduciary duty.

It is clear that the district court determined that the rule as promulgated was properly authorized by section 14(e) of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. § 78n(e) (1988), *see United States v. Chestman*, 704 F.Supp. 451, 454–58 (S.D.N.Y.1989), and instructed the jury in accordance with that determination. Chestman's convictions on all counts, in my view, must accordingly be reversed.

Section 14(e) provides:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

15 U.S.C. § 78n(e) (1988).

The second sentence of this section was added by amendment in 1970, and is the

purported authorization for the Commission's promulgation of rule 14e–3 in a form which includes no requirement that a fiduciary duty be breached. Knowing violations of rule 14e–3 are rendered criminal by 15 U.S.C. § 78ff(a) (1988).

Rule 14e–3 provides in pertinent part:

(a) If any person has taken a substantial step or steps to commence, or has commenced, a tender offer (the "offering person"), it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e) of the Act for any other person who is in possession of material information relating to such tender offer which information he knows or has reason to know is nonpublic and which he knows or has reason to know has been acquired directly or indirectly from:

(1) The offering person,

(2) The issuer of the securities sought or to be sought by such tender offer, or

(3) Any officer, director, partner or employee or any other person acting on behalf of the offering person or such issuer, to purchase or sell or cause to be purchased or sold any of such securities or any securities convertible into or exchangeable for any such securities or any option or right to obtain or to dispose of any of the foregoing securities, unless within a reasonable time prior to any purchase or sale such information and its source are publicly disclosed by press release or otherwise.

17 C.F.R. § 240.14e–3(a) (1989).

The rule plainly states that "it shall constitute a fraudulent, deceptive or manipulative act or practice within the meaning of section 14(e)" to trade on insider information in the tender offer context, absent prior public disclosure of the inside information and its source, *without more.* Specifically, there is no requirement that any fiduciary duty exist or be violated. I note in this connection that rule 14e–3 was promulgated by the Commission on September 12, 1980, see 45 Fed.Reg. 60,418 (1980), in the immediate aftermath of the Supreme Court's ruling on March 18, 1980 in *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), that a breach of fiduciary duty is essential to establish a violation of section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b) (1988), and rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5 (1989), *see Chiarella,* 445 U.S. at 229, 100 S.Ct. at 1115; and that "a duty to disclose under § 10(b) does not arise from the mere possession of nonpublic market information." *Id.* at 235, 100 S.Ct. at 1118.[1]

As a general matter, principles developed under rule 10b–5 are applicable in determining whether section 14(e) violations have been committed. *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 961 (2d Cir.1987) (citing *Chris–Craft Indus. v. Piper Aircraft Corp.,* 480 F.2d 341, 362 (2d Cir.), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973)). As has been seen, Section 14(e) authorizes the Commission to prescribe rules which will "define ... such acts and practices as are fraudulent, deceptive or manipulative" in the tender offer context. This authorization, however, seems directed at the application of these legal concepts in a relatively novel area (especially in 1970, when section 14(e) was amended to add this language), *see Schreiber v. Burlington Northern, Inc.,* 472 U.S. 1, 11, 105 S.Ct. 2458, 2464, 86 L.Ed.2d 1 (1985) (section 14(e) requires disclosure "more explicitly addressed to the tender offer context than that required by § 10(b)"), rather than to constitute an authorization for the Commission to redefine

---

1. For these reasons, I am unable to agree with the separate concurring opinion of Judge Carman that rule 14e–3 as promulgated by the Commission, aided by a presumption of regularity, should be read to imply a requirement that a fiduciary duty exist and be breached. I note also that the government brief, signed by the general counsel of the Commission and two other Commission attorneys, implicitly repudiates this view of the Commission's handiwork by vigorously contending that the Commission was authorized to promulgate rule 14e–3 without including any such requirement. In any event, I agree with Judge Carman that section 14(e) of the 1934 Act requires the existence and breach of a fiduciary duty, whether or not rule 14e–3 does, and that Chestman's convictions for violation of rule 14e–3 (and thus, by necessary implication, section 14(e)) must accordingly be reversed.

the meaning of the terms "fraudulent, deceptive or manipulative" as established by authoritative Supreme Court interpretations of section 10(b) and rule 10b–5, upon which section 14(e) is concededly modeled. *See Schreiber*, 472 U.S. at 104 n. 10, 105 S.Ct. at 2462–63 n. 10. In this connection, *Schreiber* explicitly states that the 1970 amendment to section 14(e) did not effect any change, or authorize the Commission to effect any change, in the basic meaning of the statutory term "manipulative." *Id.* at 11 n. 11, 105 S.Ct. at 2464 n. 11. I doubt that greater authority was provided to the Commission to redefine the statutory term "fraudulent."

I understand that courts defer to administrative agencies in the area of their expertise. *See, e.g., Butterton v. Francis*, 432 U.S. 416, 425–26, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977). However, as the Supreme Court said in rejecting a similar effort by the government (as an *amicus curiae*) to fashion an excessive breadth for rule 10b–5, "[t]he rulemaking power granted to an administrative agency charged with the administration of a federal statute is not the power to make law." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 213, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976). Furthermore, "because the governing standard is set forth in a criminal statute [here, 15 U.S.C. § 78ff(a) (1988) in tandem with rule 14e–3], it is appropriate to apply the rule of lenity in resolving any ambiguity in the ambit of the statute's coverage." *Crandon v. United States*, — U.S. —, —, 110 S.Ct. 997, 1001, 108 L.Ed.2d 132 (1990); *see also id.* at —, 110 S.Ct. at 1006; *id.* at —, 110 S.Ct. at 1001 (Scalia, J., concurring in the judgment).

I am not persuaded by the government's contention that subsequent statutory enactments evidence Congressional adoption of the Commission's view of rule 14e–3. In my view, the very casual references to rule 14e–3 in H.R.Rep. No. 910, 100th Cong., 2d Sess. 14 (1988), *reprinted in* 1988 U.S.Code Cong. & Admin.News 6043, 6051, and H.R. Rep. No. 355, 98th Cong., 1st Sess. 13 n. 20 (1983), *reprinted in* 1984 U.S.Code Cong. & Admin.News 2286 n. 20, provide no basis for concluding that later statutory enactments have recognized not only the promulgation and existence of rule 14e–3, but also the Commission's claim that rule 14e–3 effects an implied repeal of any fiduciary duty requirement in the area of tender offer fraud.

In particular, H.R.Rep. No. 98–355 explicitly states that the legislation on which it reports, the Insider Trading Sanctions Act of 1984, "does not change the underlying substantive case law of insider trading as reflected in judicial and administrative holdings." *Id.* at 13. Similarly, H.R. No. 100–910 makes clear that the Insider Trading and Securities Fraud Enforcement Act of 1988 does not address the substantive law of insider trading. *Id.* at 7.

In view of the foregoing, I conclude that Chestman's convictions on all counts must be reversed.

CARMAN, Judge, concurring in part and dissenting in part:

I concur with Judge Mahoney as to Parts I, II and III of Judge Miner's opinion for the court, reversing Chestman's securities fraud, mail fraud and perjury convictions. As to Part IV, I concur with the result of Judge Mahoney's opinion reversing Chestman's conviction for violations of rule 14e–3.

An examination of rule 14e–3 and 15 U.S.C. § 78n(e) (1988) ("section 14(e)") leads to the conclusion that there should be no conviction of a crime under rule 14e–3 unless there has been separate substantive proof of fraudulent, deceptive, or manipulative acts. Since the trial court declined to instruct the jury as to the elements of fraud, Chestman's convictions for violation of rule 14e–3 should be reversed.

The scope of the rule should not be permitted to exceed the powers granted to the SEC by the statute. *Cf. Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 214, 96 S.Ct. 1375, 1391, 47 L.Ed.2d 668 (1976). It would seem we should first examine the statute, 15 U.S.C. § 78n(e) and then the rule, 17 C.F.R. § 240.14e–3 (1988). *Cf. Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472–73,

97 S.Ct. 1292, 1300–01, 51 L.Ed.2d 480 (1977).

Section 14(e) by its own terms makes it "unlawful for any person ... to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer...." 15 U.S.C. § 78n(e). Congress delegated authority to the SEC in section 14(e) to promulgate regulations to "define ... such acts and practices as are fraudulent, deceptive, or manipulative" in the context of tender offers. *Id.* The Supreme Court stated in *Schreiber v. Burlington Northern, Inc.,* that in enacting section 14(e) Congress was concerned with "requiring disclosure more explicitly addressed to the tender offer context than that required by § 10(b) [of the Securities Exchange Act of 1934]." 472 U.S. 1, 11, 105 S.Ct. 2458, 2464, 86 L.Ed.2d 1 (1985).

Rule 14e–3, although it does not use the term, effectively gives insider status to any person, except the tender offeror, exclusively and based upon his possession of nonpublic information which he knows or has reason to know has been acquired directly or indirectly from: (1) the offering person, (2) the issuer of the securities sought or to be sought by such tender offeror, or (3) any officer, director, partner, or employee or any other person acting on behalf of the offering person or such issuer. The rule declares "it shall constitute a fraudulent, deceptive or manipulative act or practice *within the meaning* of section 14(e) *of the Act*" for the insider to trade in such securities unless within a reasonable time prior to any purchase or sale, such information and its source are publicly disclosed by press release or otherwise. 17 C.F.R. § 240.14e–3(a) (emphasis added). This type of provision has been characterized as a "disclose or abstain" rule. *Cf. Chiarella v. United States,* 445 U.S. 222, 227, 100 S.Ct. 1108, 1114, 63 L.Ed.2d 348 (1980) (construing rule 10b–5, 17 C.F.R. 240.10b–5).

A plain reading of rule 14e–3 could lead to the conclusion that if a defendant were to violate all of the interdictions outlined in rule 14e–3 the defendant could be guilty of a crime even if no fraud, deception or ma-

nipulation were separately and substantively proven. Mere possession of the material nonpublic information under the circumstances outlined in rule 14e–3 without proving the elements of fraud would seem to be sufficient to convict.

If that interpretation were to be adopted, I would be obliged to agree with Judge Mahoney that the rule should be held invalid as exceeding the authorization granted to the SEC by Congress. *See* Note, *Rule 14e-3: Invalid in the Criminal Context,* 16 Am.J.Crim.L. 367 (1979). At no place is it shown that Congress delegated to the SEC the power to redefine fraud. Congress directed only that the SEC prescribed means reasonably designed to prevent fraudulent, deceptive or manipulative acts and practices by rules and regulations. *See* 15 U.S.C. § 78n(e).

It appears to me that as an administrative agency, the SEC is entitled to a presumption of regularity in the conduct of its affairs and that it will act properly and according to law in carrying out its statutory mandate. *See FCC v. Schreiber,* 381 U.S. 279, 296, 85 S.Ct. 1459, 1470, 14 L.Ed.2d 383 (1965). In promulgating rule 14e–3 shortly after the *Chiarella* decision, the SEC seeking to implement the will of Congress as expressed in section 14(e) can be presumed to have contemplated that the rule would be read to include commonly accepted principles and elements associated with fraud. It is for this reason that I agree with the trial court and Judge Miner that the promulgation of rule 14e–3 was not an invalid exercise of the SEC's rule-making authority pursuant to section 14(e).

In recognition that rule 10b–5 was the model for rule 14e–3, *see Schreiber v. Burlington Northern, Inc.,* 472 U.S. at 10, 105 S.Ct. at 2463, courts have generally applied the principles developed in the context of rule 10b–5 to violations of rule 14e–3. *See, e.g., Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 961 (2d Cir.1987). I see no reason why this case should be an exception.

As a general matter, fraud requires proof of the elements of scienter, *see Dirks v. SEC,* 463 U.S. 646, 663 n. 23, 103 S.Ct.

3255, 3261 n. 23, 77 L.Ed.2d 911 (1983) ("Scienter—'a mental state embracing intent to deceive, manipulate, or defraud,' *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–194, n. 12 [96 S.Ct. 1375, 1381, n. 12, 47 L.Ed.2d 668] (1976)—is an independent element of a Rule 10b–5 violation."), and breach of a duty. *Chiarella*, 445 U.S. at 228, 100 S.Ct. at 1114. Fraud in the context of a failure to disclose under the securities laws requires a showing that the accused has violated an affirmative duty to speak. *Id.* at 235, 100 S.Ct. at 1118 ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak.").

The Court in *Chiarella* stated "the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *Id.* at 228, 100 S.Ct. at 1114 (quoting *Restatement of Torts* (Second) § 551(2)(a) (1976)); *see also Dirks*, 463 U.S. at 656 n. 15, 103 S.Ct. at 3262 n. 15 ("mere possession of nonpublic material information does not give rise to a duty to disclose or abstain ...") (construing rule 10b–5).

Here, the trial judge apparently declined to instruct the jury on all the elements of fraud, explicitly rejecting a request to instruct on scienter. *See United States v. Chestman*, 704 F.Supp. 451, 459 (S.D.N.Y. 1989). Instead, the court instructed merely on the "willfulness" standard embodied in 15 U.S.C. § 78ff (1988). *Id.; United States v. Chestman*, CR–88–455, Trial Transcript at 903–10 (S.D.N.Y. March 13, 1989). A "willfulness" instruction alone is not sufficient. The failure to instruct on all the elements of fraudulent nondisclosure, including that the defendant possessed a mental state embracing an intent to deceive, manipulate, or defraud, that is, that the defendant knew he had a duty to disclose and intentionally failed to do so, is in my opinion fatal to his conviction.

Lastly, I adopt Judge Mahoney's view of the proper application of the rule of lenity in this case in favor of Chestman.

Accordingly, I conclude that Chestman's convictions on all counts must be reversed.